UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
KENNETH F. PHILLIPS,                                    :

               Plaintiff,                    :        07 Civ. 3417 (DAB) (DF)

      -against-                                  :        **REPORT AND**
                                              **RECOMMENDATION**
REED GROUP, LTD., REED GROUP, LLC,                      :
STACEY GRACE, PRESLEY REED, and
PETER B. NAGEL, as Trustee of the                      :
Presley Reed 1999 Family Trust,
                                       :
               Defendants.
                                       :
------------------------------------------------------------X

**TO THE HONORABLE DEBORAH A. BATTS, U.S.D.J.:**

<u>**INTRODUCTION**</u>

       In this diversity action, Kenneth F. Phillips ("Plaintiff") brings claims for breach of

contract, negligent misrepresentation, breach of fiduciary duties, quantum meruit, promissory

estoppel, and unjust enrichment.  All five defendants in this matter (collectively "Defendants")

move to dismiss Plaintiff's Amended Complaint on the basis of improper venue, or,

alternatively, for failure to state any claim upon which relief can be granted.  Four defendants

further contend that this Court lacks personal jurisdiction over them.  All Defendants request that

the case, if not dismissed in its entirety, be transferred to the District of Colorado.

       As explained below, I recommend that Defendants' motion (Dkt. 28) be granted to the

extent it seek to dismiss Plaintiff's claims against defendant Peter B. Nagel ("Nagel") for lack of

personal jurisdiction.  As to Plaintiff's claims against the other named defendants, I recommend

that portions of Plaintiff's promissory estoppel claim, as well as portions of his breach of

fiduciary duty claim, be dismissed, and that he be afforded an opportunity to replead his

negligent misrepresentation claim so as to satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Federal Procedure.  I recommend that Defendants' motion be denied in all other respects.

## BACKGROUND

### A.    Procedural History

Plaintiff, proceeding *pro se*, commenced this suit in the Supreme Court of the State of New York, County of New York, on April 11, 2007.[1]  Defendants removed the case to this Court on April 30, 2007, pursuant to 28 U.S.C. § 1441.  (Dkt. 1.)  Removal to this Court was proper because there is complete diversity of citizenship between Plaintiff and Defendants and the matter in controversy exceeds $75,000.  On July 25, 2007, Defendants filed a motion to dismiss the Complaint or, in the alternative, to transfer the case to the District of Colorado (Dkt. 10), which the Court denied as moot because Plaintiff filed his Amended Complaint soon after Defendants had filed their motion (Dkt. 23).  Defendants then filed another motion to dismiss or, in the alternative, to transfer (Dkt. 28), raising arguments nearly identical to those raised in their first motion (*see* Dkts. 10, 11).  The pending motion (Dkt. 28) has been referred to me for a Report and Recommendation.

---

[1] On December 10, 2010, Kenneth Barrett Phillips filed a notice of appearance on behalf of Plaintiff.  (Dkt. 42.)

B.     **Factual Allegations**

Except where otherwise noted, the following facts are alleged in Plaintiff's Amended Complaint, dated August 27, 2007 ("Am. Compl.") (Dkt. 22), and are accepted as true for the purposes of this motion.[2]

1.     **The Parties**

a.     **Plaintiff**

Plaintiff is a Massachusetts resident and was a member of the Boards of Directors of corporate defendants Reed Group, Ltd. (the "LTD") and Reed Group, LLC (the "LLC") during relevant time periods from 2002 to 2006.  (Am. Compl. at ¶ 1; *see also* Declaration of Peter Nagel, dated Sept. 26, 2007 ("9/26/07 Nagel. Decl.") (Dkt. 28), at ¶ 12.[3])  Plaintiff joined the Board of the LTD in 2002 after defendant Presley Reed ("Reed"), while in New York City,[4] invited him to join.  (Am. Compl. at ¶ 12(g); Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint, dated Oct. 26, 2007 ("Pl. Mem.") (Dkt. 32), at 22.)

---

[2] *See* Discussion *infra*, at Point I(D).

[3] Nagel has submitted two so-called "declarations" in support of Defendants' motion, but neither is in admissible form.  Although Nagel states that his declarations are "[e]xecuted pursuant to 28 U.S.C. § 1746," the facts he sets forth are not declared to be true under the penalty of perjury, as required by that statute.  (*See* 9/26/07 Nagel Decl.; *see also* Second Declaration of Peter Nagel, dated Nov. 8, 2007 ("11/8/07 Nagel Decl.") (Dkt. 36).)

[4] Throughout their submissions, the parties consistently refer to "New York" without specifying whether they mean New York State or New York City.  The Court will thus use the ambiguous "New York" except where it can reliably ascertain that a particular factual allegation concerns New York City or New York State.

b.      **Corporate Defendants**

The LTD and the LLC (together, the "Reed Companies") are, respectively, a Colorado corporation and a Colorado limited liability company.  (*See id.* at ¶¶ 2-3.)  Each maintains its principal place of business in Westminster, Colorado.  (*Id.*)  The LTD also maintains an office and mailing address in Albany, New York, where it employs approximately 80 people.  (*Id.* at ¶ 11(a).)  According to Plaintiff, 40 percent of the LTD's revenue is generated in New York State.  (*Id.* at ¶ 11(b).)  Plaintiff alleges that the LLC, which was formed in 2004, was "designed to be the successor to [the LTD]."  (Declaration of Kenneth Phillips, dated Oct. 26, 2007 ("Phillips Decl.") (Dkt. 31), at ¶ 4).  Indeed, he alleges that the "only company that exist[ed] in all [of] 2005 as Reed Group [was] the LLC."  (Am. Compl. at ¶ 63.)

According to Plaintiff, the LTD was – and is, to the extent it remains in business as an operating company – "a business process outsourcer providing publications as hardcopy and by subscription over the internet, [as well as] software and services that streamline employee absence operations for employers."  (Am. Compl. at ¶ 2.)  The LTD has marketed, sold and distributed two relevant products:  (1) the Medical Disability Advisor (the "MDA" or "MDA 5.0"), and (2) a database called the Utilization Management Knowledgebase (the "UMK" or the "ACOEM UMK"), which is, according to Defendants, owned by the American College of Occupational and Employment Medicine (the "ACOEM").  (*See* Am. Compl. at ¶ 11(d), (e)(iv); 9/26/07 Nagel Decl. at ¶ 26; 11/8/07 Nagel Decl. at ¶ 6.)  Plaintiff describes these products as "guideline product[s]" or "guideline software."  (Am. Compl. at ¶ 11(d).)

Plaintiff alleges that he created the ACOEM UMK at his own expense.  (*Id.* at ¶ 33.)  He further alleges that the MDA has become "much more valuable and relevant to the market" as a result of being sold in combination with the ACOEM UMK.  (*Id.*)  By combining the ACOEM

4

UMK and the MDA, Defendants purportedly "minimize[d] the position of the only competitor to the [MDA]."  (*Id.* at ¶ 33 n.14.)

<strong>c.      Individual Defendants</strong>

Individual defendants Reed, his wife Stacey Grace ("Grace"), and Nagel are all Colorado residents.  (Am. Compl. at ¶¶ 4-7.)

Nagel, an attorney who practices in Colorado, is Trustee of the Presley Reed 1999 Family Trust, a trust which owns approximately 30 percent of the LTD.  (*Id.* at ¶ 7; 9/26/07 Nagel Decl. at ¶ 1.)  Nagel also serves as outside counsel to the Reed Companies.  (Am. Compl. at ¶ 7.) Before this Court, Nagel has stated that he neither owns any property nor conducts business in New York.  (9/26/07 Nagel Decl. at ¶ 11.)

Reed and Grace are the sole members of the LLC.  (Am. Compl. at ¶ 5.)  Reed is also Chairman and Chief Executive Officer of the LTD, and Grace is President of the LTD.  (*Id.* at ¶¶ 4-5.)  Plaintiff alleges that Reed and Grace "exhibit dominant control of all corporate action" of the corporate defendants (*id.* at ¶¶ 91-95), and that they behave "in their own personal interest rather than in the best interest of [the LTD]" (*id.* at ¶ 16(a) (emphasis omitted); *see also id.* at ¶¶ 11(d), 14(b), 33, 39; Pl. Mem. at 15).  Plaintiff further alleges that Reed and Grace personally own the MDA product that the LTD has used in its operations.  (Am. Compl. at ¶ 16.)  Plaintiff also contends that Reed and Grace "travel to New York extensively to present for sales purposes" (*id.* at ¶ 11(e)(I); *see id.* (noting that Defendants have a large "number of New York City clients")), and that these defendants have, in particular, attempted to convince the New York State Insurance Fund to use the MDA product (*id.* at ¶ 11(e)(2)).

Plaintiff also alleges that Reed has himself conducted a significant amount of business in New York City, including the following:

5

- holding meetings with Plaintiff in New York City on numerous occasions from 2002 through 2005, including a meeting in 2002, at which time Reed asked Plaintiff to join the Board of Directors, and a meeting in 2005, at which time the Reed and Plaintiff discussed a joint venture.   (*Id.* at ¶ 12; Pl. Mem. at 22.)

- "maintain[ing] an 'interactive' website that distributes the MDA 5.0 guidelines as well as the new ACOEM UMK product . . ."   (Am. Compl. at ¶ 11(d).)

- running a seminar in New York City on October 10, 2006, along with Grace, as part of an effort to reach potential New York clients.  (*Id.* at ¶ 11(e)(iii).)

- acting as "an active participating Member and Director of the New York Claim Association," located in New York City, which afforded Reed "a marketing opportunity directed to New York organizations i.e. the members."   (*Id.* at ¶ 11(f)(i).)  According to Plaintiff, "Reed spoke to this group on Sept. 19, 2006 with [Plaintiff] present."  (*Id.*)

- planning "to develop a Masters Level Program in collaboration with NYU [New York University, located in New York City]," and being "appointed to the Board of [t]he Occupational and Industrial Orthopedic Center (OIOC) at NYU."  (*Id.* at ¶ 11(f)(ii).)

Plaintiff does not specifically allege whether Reed performed these activities on Reed's own behalf, or on behalf of either of the Reed Companies.

### 2. <u>The Services Allegedly Rendered by Plaintiff to Defendants</u>

Plaintiff alleges that, at Defendants' request, he worked more than 5000 hours for the LTD,[5] contributed $30,000 in capital to the LTD, and absorbed $50,000 in expenses incurred as an advisor and board member of the LTD and as joint venture partner of the LTD, Reed, and Grace.  (Am. Compl. at ¶¶ 18, 21, 33, 49; *see also* 9/26/07 Nagel Decl. at ¶¶ 30-31.)  Plaintiff

---

[5] Some of this work was allegedly performed for the LTD's predecessor corporation and for the LLC (the LTD's planned successor).  (Am. Compl. at ¶ 18.)

claims that he received no compensation for these services, even though he "helped generate over $50 [m]illion in value for Defendants." (Am. Compl. at ¶¶ 18, 22.)

Plaintiff claims to have created the ACOEM UMK product in the course of his so-called "Joint Venture" work for Defendants. (*See* Am. Compl. at ¶¶ 33, 38, 40(a).) Plaintiff alleges that he spent at least 1500 hours working on this project. (*Id.* at ¶ 40(a); *see also id.* at ¶ 113 (alleging that Plaintiff worked "well over 2000 hours" on the project).) He further alleges that he paid consulting fees of $30,000 and "provided hardware and support in the range of approximately $100,000" in his efforts to create the product. (*Id.* at ¶ 113.)

Plaintiff also claims to have engaged in "investment banking" work for Defendants, allegedly helping Defendants to develop a favorable investment strategy and to obtain favorable results for the LTD within the private equity investment community. (*See id.* at ¶¶ 34, 38, 40(b).) According to Plaintiff, he "prepared all of the materials that were used, arranged the meetings, presented the information and secured the offers" from investors. (*Id.* at ¶ 34.) Plaintiff alleges that he worked 2000 hours on this project. (*Id.* at ¶ 40(b).)

Defendants, for their part, contend that the "vast majority of services upon which Plaintiff bases his claims were performed in Colorado or Massachusetts and allegedly accepted by Defendants in Colorado." (Defendants' Memorandum of Law in Support of Motion to Dismiss or in the Alternative Transfer to the District of Colorado, dated Sept. 27, 2007 ("Def. Mem.") (Dkt. 29), at 20 (citing 9/26/07 Nagel Decl. at ¶ 12).) Plaintiff largely disputes this assertion, stating that he was in New York more often than he was in Colorado during the relevant time period. (*See* Phillips Decl. at ¶ 2(c)(iii).)

### 3.   **Defendants' Alleged Promises**

As described further below, Plaintiff alleges that he worked for Defendants in "reliance on Defendants' promise of an equitable share of the growth he created," which was apparently to be comprised of (a) a percentage of ownership of the LLC (the supposed successor company to the LTD), (b) a share of the business's revenue, and (c) a share in the proceeds of the sale of the LTD, if such a sale could be accomplished.  (Am. Compl. at ¶ 18, 46.)  Plaintiff alleges that Reed and Grace agreed to provide him with equity in order to obtain his services "without paying any current compensation."  (*Id.* at ¶¶ 23, 45; *see also id.* at ¶ 20 (alleging that this promise was made "in lieu of direct current payment for these services").)

### a.   **Ownership Agreement**

Plaintiff specifically alleges that, during a February 2004 discussion in New York, he and Reed discussed a plan to have Plaintiff work in exchange for equity.  (*Id.* at ¶ 12(i).)  This discussion allegedly occurred after Reed had traveled to New York to meet with a job candidate for the position of Chief Executive Officer.  (*Id.*)  During his discussion with Reed, Plaintiff "shared his over[]all expectation that under normal circumstances [Plaintiff] expected 1% of the enterprise for Board service (which was uncompensated); 1% for providing direction in Outsourcing . . . which would include some Information Technology leadership and strategy; and 1% of the enterprise for product development."  (*Id.*)  In response to Plaintiff's expressed "expectation" of a three percent total equity interest, Reed allegedly "agreed that these amounts were reasonable and suggested [that he and Plaintiff] proceed."  (*Id.*)

Later that year, Reed allegedly gave Plaintiff an unsigned LLC operating agreement which, according to Plaintiff, reflected Reed's understanding of his promise to Plaintiff that Plaintiff would receive an equity interest in the business.  (*See* Am. Compl. at ¶ 69.)  According

to this unsigned agreement, Plaintiff would receive a two percent (rather than a three percent) ownership interest in the LLC.  (*Id.*; *id.* at 48, ¶ 4; Pl. Mem. at 5.)  This unsigned agreement was subsequently presented to the Board of Directors and was "accepted" by Plaintiff, in his capacity as an outside director, in March 2005.  (Am. Compl. at ¶ 25.)  Plaintiff alleges that he considered his "Agreement" with Reed "to be in force[,] based on the assurances [he] had received from Defendants as well as the actions and the silence of the Defendants."  (*Id.* at ¶ 30.)  In addition, Plaintiff generally alleges that Reed "held the fact out that [Plaintiff] was an 'owner' to potential investors to instill confidence in the company by said investors."  (*Id.* at ¶ 86.)

### b.   <u>Joint Venture</u>

Plaintiff further alleges that, at various meetings he had with Reed (including a May 2005 meeting in New York City), Plaintiff presented a joint venture plan regarding the creation, marketing and distribution of the ACOEM UMK product.  (*See* Am. Compl. at ¶ 12(j)(k); Pl. Mem. at 22.)  Under this purported joint venture plan, Plaintiff would bear the initial costs and thereafter would receive "15% of the value of the product as a joint [v]enture owner and . . . an appropriate portion of the revenue."  (Am. Compl. at ¶ 12(j)(k).)  Reed allegedly stated that this plan "'seemed fair'" and told Plaintiff to continue working on the product.  (*Id.*)  In June 2005, Reed asked Plaintiff for clarification of their business arrangement and Plaintiff responded that, on the ACOEM UMK project, "I am a [j]oint venture[r] with you and Stacey [Grace]."  (*Id.* at ¶ 110.)  Plaintiff generally alleges that the conduct and representations of Reed and Grace caused him to believe that he was in a joint venture with them.  (*See id.* at ¶ 110.)  Plaintiff states, however, that "no call or meeting with [the LTD] has ever taken place concerning the [joint venture] profit sharing arrangement."  (*Id.* at ¶ 113.)

Defendants contend that there was never a joint venture agreement or any agreement that Plaintiff would have an ownership interest in the ACOEM UMK – a product that, in any event, Defendants claim they do not own.  (9/26/07 Nagel Decl. at ¶ 29; *see id.* at ¶ 26 (stating that the ACOEM UMK is owned by the ACOEM trade association).)  According to Defendants, while Plaintiff took an active role in negotiating the contract between the LTD and ACOEM, this contract did not include an ownership interest or profit share for Plaintiff.  *Id.* at ¶ 29.

### c.   Compensation for Successful Sale of the LTD

According to Plaintiff, Reed promised Plaintiff additional compensation, if Plaintiff were able to structure a favorable sale of the LTD.  (*See* Am. Compl. at ¶¶ 132-138.)  Reed allegedly told Plaintiff that "the 'more he (REED) could get (as an offer) the more he ([Plaintiff]) would receive.'"  (*Id.* at ¶ 132.)  Plaintiff allegedly helped secure an offer to purchase the LTD in September 2006, although he does not allege that the transaction was ever completed.  (*See id.* at ¶ 137.)

### 4.   Alleged Abuse of the Corporate Form

Plaintiff alleges that Reed and Grace "created, dissolved, reinstated, renamed and maintained" the Reed Companies in a manner that "often ma[de] it difficult to see just what activities ha[d] occurred, done by what entity and to what purpose."  (*Id.* at ¶ 163.)  For example, according to Plaintiff, in 2005, the Reed Group, Ltd. (*i.e.*, the LTD) "did not exist by that name but [that name] was used on TENS of thousands of pieces of correspondence, advertising, checks and even in legal and regulatory contexts such as filings and copyright notice[s]."  (*Id.* at ¶ 164 (emphasis in original).)

Plaintiff claims that, even while making confusing or misleading use of the "Reed Group" name, Reed and Grace held out the LLC as "the successor to the very valuable [LTD]"

10

and offered equity in the LLC to various individuals, including Plaintiff.  (Am. Compl. at ¶¶ 167-68.)  It was Plaintiff's understanding that, at least during 2005, the LLC proceeded to conduct business operations and informed the public of its activities.  (*See id.* at ¶ 26; *see also* Phillips Decl. at ¶ 14.)  More specifically, according to Plaintiff, the LLC "held Board meetings . . ., published Board minutes . . ., exhibited ownership of the MDA . . ., entered into contracts, solicited business, [and] held and disposed of assets."  (Am. Compl. at ¶ 26.)  Beyond his pleading, Plaintiff has submitted at least three press releases from the LLC suggesting that the LLC engaged in business.  (*See* Phillips Decl., Exs. K, L, R.)  One of these press releases states that the LLC "publishes the . . . [MDA]," in both textbook and software form, and that the LLC "maintains four key lines of business:  Guidelines, Service, Data Analytics, and Education."  (*Id.*, Ex. K.)  It further states that the LLC "provides integrated disability case management service for non-occupational and occupational leave[]," and has exclusive business relationships with Aetna, Standard Insurance Company, and others.  (*Id.*)[6]

Defendants, however, have maintained in this litigation that they "decided not to go forward" with the LLC (*see* 9/26/07 Nagel Decl. at ¶ 46; *see also* Declaration of Peter Nagel, dated July 25, 2007 (Dkt. 13), at ¶ 15 (cited by Plaintiff in the Am. Compl. at ¶ 28)) and that the LLC "'never operated as a business'" (*id.* at ¶ 7 (cited by Plaintiff in the Am. Compl. at ¶ 28); *see also* 9/26/07 Nagel Decl. at ¶ 6 (stating that, although the LLC was formed in 2004, it never operated as a business and did not have employees, assets, an operating agreement, or

---

[6] These press releases also demonstrate a certain degree of carelessness with respect to the use of the "Reed Group" name.  The April 2005 press release, for example, specifically refers to the Reed Group, LLC (not the Reed Group, Ltd.) as the "Reed Group," but then states that "Dr. Presley Reed founded Reed Group in 1981" and that "Reed Group is a privately held Colorado corporation" – statements that, on their face, appear to refer to the LTD.  (Phillips Decl., Ex. K.)

members).)  Defendants also assert that use of the LLC name was limited to press releases and board meeting minutes, that the use of the name ceased six months after the LLC was formed and that, at the time the Complaint was filed, the LLC had been inactive for more than two years. (9/26/07 Nagel Decl. at ¶ 6.)

Plaintiff, as set out above, does not concede that this is true, but he pleads in the alternative that, if the LLC did not actually operate, then Reed and Grace created it as a "shell company," and "proceeded to use this shell, [the] LLC[,] as if it were becoming the primary company used by [them] to announce the launch of the firm's premier and most profitable product, [the] MDA."  (Am. Compl. at ¶ 176-77.)  Plaintiff alleges that Reed and Grace certainly caused him to believe that he had an equity interest in the LLC and that the LLC was "operating as . . . intended."  (*Id.* at ¶ 178.)  Plaintiff claims that he was never informed of any decision to abandon the LLC, and that, based on his belief that the LLC was going forward, he performed services for Defendants for 18 additional months, accepting the purported equity interest in lieu of additional compensation.  (*Id.* at ¶¶ 29-30, 56(a), 178.)

To the extent that Reed and Grace created an "LLC shell" in order to induce Plaintiff to create the ACOEM UMK product, Plaintiff appears to alleges that Reed and Grace abused the corporate form.  (*See* Am. Compl. at ¶¶ 39, 176-79.)  In addition, Plaintiff alleges that these defendants combined the ACOEM UMK with the MDA (the former of which Plaintiff allegedly developed, and the latter of which was allegedly Reed and Grace's "personal property") for their own personal gain.  (Am. Compl. at ¶ 39.)  Plaintiff further alleges that Reed and Grace violated their fiduciary responsibilities to the LTD and the LLC because they never informed Plaintiff, an outside director of both corporations, of their conflict of interest arising from their ownership of the MDA.  (*Id.*)

Plaintiff also alleges that Reed and Grace not only personally own the MDA product, but that they hid this ownership from Plaintiff, other board members, partners, and clients.  (*See* Am. Compl. at ¶ 92.)  To support his allegations regarding the ownership of the MDA, Plaintiff submits an August 27, 2004 memorandum from consultant Jim Casart ("Casart") to the LTD, Reed, and Grace, which discusses the possibility of forming an LLC.  (*See* Pl. Mem., Ex. A.)  In this memorandum, Casart explains that "[i]n the summer of 2003, the Reeds [*i.e.*, Reed and Grace] were given . . . the intellectual property associated with the disability guidelines business," and further notes that, as of the date of the memorandum, "the intellectual property rights to the guidelines remain the property of the Reeds, personally."  (*Id.*)  Defendants do not directly address the portion of Casart's memorandum regarding Reed and Grace's ownership of this intellectual property.  Defendants contend, however, that documents from the United States Copyright Office demonstrate that the LTD owns the MDA.  (9/26/07 Nagel Decl. at ¶ 45; *id.* at Ex. G.)

Plaintiff also alleges that the LTD has failed to comply with certain corporate administration requirements.  He alleges that the LTD never formally elected directors and never published or approved formal board minutes.  (Am. Compl. at ¶ 172-73.)  He further alleges that the LTD never registered to do business in New York State (and does not maintain an agent for service of process there), even though it does business in New York State and employs over 50 people there (*id.* at ¶ 170).  Defendants generally maintain that the LTD does not abuse the corporate form because it is a "small closely held corporation[]" that "holds boarding meetings, has outside board members and does not intermingle personal and corporate assets."  (9/26/07 Nagel Decl. at ¶ 46.)

## DISCUSSION

## I.   APPLICABLE LEGAL STANDARDS

Where the grounds for a motion to dismiss include lack of personal jurisdiction, improper venue, and failure to state a claim upon which relief can be granted, the Court must first consider the jurisdictional claims before considering the merits of the case.  *See Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963) ("A court without such jurisdiction [over the defendant] lacks power to dismiss a complaint for failure to state a claim.").

### A.   Rule 12(b)(2)

Rule 12(b)(2) of the Federal Rules of Civil Procedure provides that an action may be dismissed for lack of personal jurisdiction.  To overcome such a motion, the "plaintiff need only make a *prima facie* showing of [personal] jurisdiction" over the defendants.  *Marine Midland Bank N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981).  The plaintiff bears the burden of establishing that the Court has jurisdiction over the defendant, but, at this stage, his burden can be satisfied by good-faith, legally sufficient allegations of jurisdiction.  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999); *Jazini v. Nissan Motors Co.*, 148 F.3d 181, 184 (2d Cir. 1998).  In ruling on a Rule 12(b)(2) motion, the Court may provisionally accept disputed factual allegations as true.  *Credit Lyonnais Securities (USA), Inc. v. Alcantara*, 183 F.3d 151, 153 (2d Cir. 1999).[7]  In addition, when considering the pleadings of a *pro se* litigant such as Plaintiff, the Court must read those pleadings liberally and

---

[7] Although a plaintiff's allegations may be deemed true for a ruling on a motion to dismiss for lack of personal jurisdiction, eventually the Court must determine whether the defendants in fact subjected themselves to the court's jurisdiction.  *Credit Lyonnais Securities (USA)*, 183 F.3d at 153.  Eventually, after discovery, the plaintiff must make a factual showing of jurisdiction by a preponderance of the evidence, sufficient to establish jurisdiction to the trier of fact.  *A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993); *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990).

14

interpret them so as to "raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir. 1999).[8]

Nonetheless, a decision on a motion to dismiss under Rule 12(b)(2), for lack of personal jurisdiction, need not be based solely on the "four corners of the complaint." Rather, on such a motion, the Court may also rely on submitted affidavits and other supporting materials submitted in relation to the motion. *Andy Stroud, Inc. v. Brown*, 08 Civ. 8246 (HB), 2009 U.S. Dist. LEXIS 18725, at *2, n.2 (S.D.N.Y. Mar. 4, 2009). The court need not hold an evidentiary hearing to decide the motion. *See Credit Lyonnais Securities (USA), Inc.*, 183 F.3d at 153; *see also CutCo Industries, Inc. v. Naughton*, 806 F.2d 361, 364 (2d Cir. 1986) (the district court is "free to decide the best way to deal with [the] question" of determining personal jurisdiction on a motion to dismiss, and may decide the motion on the basis of affidavits alone or it may permit discovery and/or an evidentiary hearing in aid of the motion). In the absence of an evidentiary hearing or a trial on the merits, all pleadings and affidavits are "construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." *A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993)*; see also CutCo Industries*, 806 F.2d at 365*; Hoffritz for Cutlery, Inc. v. Amajac, LTD*, 763 F.2d 55, 57 (2d Cir. 1985).

Personal jurisdiction over a defendant in a "diversity action is determined by the law of the forum in which the court sits." *Arrowsmith*, 320 F.2d at 223; *see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002). Thus, this Court's determination in this case must be based on New York's law of personal jurisdiction. Under

---

[8] Although it appears that Plaintiff has recently retained an attorney to represent him in this matter (*see* n.1, *supra*), the Amended Complaint and opposition the instant motion were filed *pro se*, and have not been supplemented since Plaintiff retained counsel.

New York law, this Court is required to engage in a two-step analysis to determine if it has personal jurisdiction over the defendants. *Bank Brussels Lambert*, 305 F.3d at 124. First, the court must determine whether New York law confers jurisdiction over Defendants to New York State courts of general jurisdiction. *Id.* If there is a state statutory basis for jurisdiction, the court must then determine whether New York may permissibly exercise personal jurisdiction over Defendants pursuant to the Due Process Clause of the 14th Amendment. *Id.*

### 1.    General Jurisdiction Under N.Y.C.P.L.R. § 301

Pursuant to Section 301 of the C.P.L.R., New York has general jurisdiction over a foreign corporation if the defendant "does business" in the state in the "traditional sense." *Ball*, 902 F.2d at 198; *Frummer v. Hilton Hotels International, Inc.*, 19 N.Y.2d 533, 536 (1967); N.Y.C.P.L.R. § 301. New York courts have consistently interpreted this standard to mean that New York courts have general jurisdiction over a defendant where the defendant is "engaged in such a continuous and systematic course" of doing business in the state as to warrant a finding of its presence in the jurisdiction. *Frummer*, 19 N.Y.2d at 536. Occasional or casual business in New York does not confer general jurisdiction in New York such that a foreign corporation may be sued in New York on causes of action that are wholly unrelated to its activities in New York. *Ball*, 902 F.2d at 198; *see also Cohen v. Vaughan Basset Furniture Co., Inc.*, 495 F. Supp. 849, 850 (S.D.N.Y. 1980).

The New York Court of Appeals has set forth several factors to determine if a foreign corporation is present in New York and therefore subject to general jurisdiction in New York. These factors include the presence of an office, employees, and bank account within New York, and the solicitation of business in New York. *Bryant v. Finnish Nat'l Airline*, 15 N.Y.2d 426, 432 (1965) (finding that New York had general jurisdiction over a foreign corporation that, in

16

New York, directly maintained an office where it employed several people, had a bank account, and engaged in public relations and publicity work for the defendant); *Hoffritz*, 763 F.2d at 58.

In addition to the "doing business" standard under Section 301, general jurisdiction can also be found where a defendant's solicitation of business in New York is "substantial and continuous, and defendant engages in other activities of substance in the state." *Landoil Resources Corp. v. Alexander & Alexander Services, Inc.*, 918 F.2d 1039, 1043-44 (2d Cir. 1990). Under this so-called "solicitation-plus" standard for personal jurisdiction, "once solicitation is found in any substantial degree very little more is necessary to a conclusion of 'doing business.'" *Id.*

In general, an employee or agent who acts on behalf of a corporation "does not subject himself, individually," to jurisdiction under Section 301. *Laufer v. Ostrow*, 449 N.Y.S.2d 456, 460 (1982). Nevertheless, under New York law, a corporation's owner whose activities "'show a disregard for the separate corporate existence of the [corporation]'" may be subject to personal jurisdiction based upon piercing of the corporate veil. *M. Prusman, Ltd. v. Ariel Maritime Group, Inc.*, 719 F. Supp. 214, 221 (S.D.N.Y. 1989) (quoting *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft*, 751 F.2d 117, 120 (2d Cir. 1984)). The question of whether a Colorado corporation's veil should be pierced, however, is a question of Colorado law. (*See* Discussion *infra*, at Point I(B).)

## 2.      Specific Jurisdiction Under N.Y.C.P.L.R. § 302(a)

Where a defendant does not fall under the "doing business" requirement of Section 301, the plaintiff may look to New York's long-arm statute, Section 302, which requires a lesser showing than that required under Section 301. *Hoffritz*, 763 F.2d at 58. Section 302(a)(1) confers specific jurisdiction over a non-domiciliary defendant if the defendant "transacts any

business within the state or contracts anywhere to supply goods or services in the state" and the cause of action arises out of these contacts.  N.Y.C.P.L.R. § 302(a)(1).  Thus, a plaintiff must demonstrate "the existence of some articulable nexus between the business transacted and the cause of action sued upon."  *McGowan v. Smith*, 52 N.Y.2d 268, 272 (1981).  In "transacting business," the party must have "purposefully avail[ed] itself of the privilege of conducting activities within New York."  *Ehrenfeld v. Bin Mahfouz*, 851 N.Y.S.2d 381, 386 (2007).  Where a party engages in purposeful activity, through volitional acts, in New York, personal jurisdiction is proper because that party has "invok[ed] the benefits and protections of New York's laws."  *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007) (internal quotation marks and citation omitted).

As New York courts have explained, Section 302(a) is a "single act statute," and "proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted."  *Kreutter v. McFadden Oil Corp.*, 527 N.Y.S.2d 195, 198-99 (1988); *see also Bank Brussels Lambert*, 171 F.3d at 787.

### 3.   Due Process Requirements

To the extent that jurisdiction over Defendants is proper under New York's jurisdictional statutes, constitutional due process considerations must be considered separately.  A court may exercise jurisdiction over only those defendants that have "minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  "In judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'"  *Calder v.*

18

*Jones*, 465 U.S. 783, 788 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)).  "To establish the minimum contacts necessary to justify 'specific' jurisdiction, the [plaintiff] first must show that [the plaintiff's] claim arises out of or relates to [the defendant's] contacts with [New York]."  *Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1027 (2d Cir. 1997) (citation omitted).  In addition, the plaintiff must show that the defendant "purposefully avails itself of the privilege of conducting activities" in New York such that it "should reasonably anticipate being haled into Court [here]."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (citation omitted).

### B.   Piercing the Corporate Veil

Under New York choice-of-law rules,[9] the law of the state of incorporation is used to determine whether the corporate veil should be pierced.  *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995); *see also Miramax Film Corp. v. Abraham*, 01 CV 5202 (GBD), 2003 U.S. Dist. LEXIS 21346, at *15-16 (S.D.N.Y. Nov. 25, 2003) (when analyzing personal jurisdiction in a diversity case, "the court applies the choice of law rules of the forum state to determine what law governs alter ego or piercing the corporate veil analysis").  Because it is undisputed that the LTD is a Colorado corporation (*see* Am. Compl. at ¶ 2; Def. Mem. at 4) and the LLC is a Colorado company (*see* Am. Compl. at ¶ 3; Def. Mem. at 4), Colorado law governs the veil-piercing question.

To pierce the corporate veil under Colorado law, the claimant must show that (1) "the corporate entity is the alter ego of the shareholder," (2) "justice requires" the veil to be pierced

---

[9] A court sitting in diversity must apply the choice-of-law rules of the forum in which it sits, and thus New York choice-of-law rules apply in this case.  *See Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 147 (2d Cir. 2008) (citing *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496-97 (1941)).

because "the corporate fiction was used to perpetrate a fraud or defeat a rightful claim . . . [and] to shield a dominant shareholder's improprieties," and (3) "an equitable result will be achieved by . . . holding the shareholder personally liable for the acts of the business entity." *Phillips v. Englewood Post No. 322 Veterans of Foreign Wars of the United States, Inc.*, 139 P.3d 639, 644 (Colo. 2006) (internal quotation marks omitted) (citing *Contractors Heating & Supply Co. v. Scherb*, 432 P.2d 237, 239 (Colo. 1967) and *Water, Waste & Land, Inc. v. Lanham*, 955 P.2d 997, 1004 (Colo. 1998)); *see also Gude v. Lakewood*, 636 P.2d 691, 697 (Colo. 1981); *Pereira v. Grecolas Ltd.*, 421 B.R. 626, 651 (Bankr. S.D.N.Y. 2009) ("The preponderance of Colorado state case law indicates that all three prongs of the foregoing analysis must be satisfied in order to establish a veil piercing claim." (citing cases)).

In determining whether a corporate entity is the alter ego of the shareholder under Colorado law, courts consider "a variety of factors, including whether (1) the corporation is operated as a distinct business entity, (2) funds and assets are commingled, (3) adequate corporate records are maintained, (4) the nature and form of the entity's ownership and control facilitate misuse by an insider, (5) the business is thinly capitalized, (6) the corporation is used as a 'mere shell,' (7) shareholders disregard legal formalities, and (8) corporate funds or assets are used for noncorporate purposes." *Phillips v. Englewood Post*, 139 P.3d at 644 (citing *Leonard v. McMorris*, 63 P.3d 323, 330 (Colo. 2003)).

**C.    Venue**

Upon timely objection, the Court shall dismiss "a case laying venue in the wrong division or district," or transfer such case to a district where it could have been brought. 28 U.S.C. § 1406(a)-(b).  For cases removed from state court, venue is proper in the federal district which embraces the state court from which the action was removed.  *See AIG Fin. Prods.*

20

*Corp. v. Public Util. Dist. No. 1*, 675 F. Supp. 2d 354, 366 (S.D.N.Y. 2009); 28 U.S.C. §1441(a).

Even if venue if proper on that ground, however, a district court may transfer a removed action

to another district where it might have been brought, if such a transfer is "in the interest of

justice" and if the convenience of the witnesses and parties warrants transfer.  28 U.S.C.

§1404(a).[10]

There is ordinarily a strong presumption in favor of a plaintiff's choice of forum, which

may be overcome only when the private and public interest factors clearly point towards trial in

the alternative forum.  *Piper Aircraft Co. v. Reyno*, 454 U.S. at 255 (1981).  The moving party

bears the burden of showing, by clear and convincing evidence, that a transfer is appropriate.

*New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 113-114 (2d Cir. 2010)

(citing cases); *Excelsior Designs, Inc. v. Sheres*, 291 F. Supp. 2d 181, 185 (E.D.N.Y. 2003)

(citing *Ford Motor Co. v. Ryan*, 182 F.2d 329, 330 (2d Cir. 1950)).  A district court has the

"power to transfer[] venue even if it lacks personal jurisdiction over defendants," as long as the

requirements of Section 1404(a) are met.  *Fort Knox Music, Inc. v. Baptiste*, 257 F.3d 108, 112

(2d Cir. 2001) (citing *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466 (1962)).

### D.    Rule 12(b)(6)

In deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, for failure to state a claim upon which relied can be granted, the Court "accept[s] as

---

[10] Section 1404 and the doctrine of *forum non conveniens* constitute distinct legal bases for transfer of cases.  *See Farmanfarmaian v. Gulf Oil Corp.*, 437 F. Supp. 910, 916 (S.D.N.Y. 1977) (noting the distinction between Section 1404 and *forum non conveniens*), *aff'd*, 588 F.2d 880 (2d Cir. 1978).  Section 1404 was a "revision," rather than a "codification," of the common law doctrine of *forum non conveniens*, and this revision gave district courts more discretion to transfer cases than they had had under common law.  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 253 (1981) (citing *Norwood v. Kirkpatrick*, 349 U.S. 29 (1955)).  Because Defendants move for transfer on Section 1404 grounds, but not on *forum non conveniens* grounds (*see* Def. Mem. at 18-21), the Court will not specifically consider the law of *forum non conveniens* here.

true all factual statements alleged in the complaint and draw[s] all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) (citation omitted); *accord Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997).  Further, "'[a]lthough a court should generally refrain from considering matters outside the pleadings when reviewing a 12(b)(6) motion to dismiss, the mandate to liberally construe *pro se* pleadings makes it appropriate to consider the facts set forth in plaintiff's opposition papers.'"  *Falso v. Gates Chili Cent. Sch. Dist.,* No. 09 Civ. 6053L, 2010 U.S. Dist. LEXIS 6233, at *3-4 (W.D.N.Y. Jan. 26, 2010) (citing *Acheampong v. United States*, Nos. 99 Civ. 2169 (SWK), 99 Civ. 3491 (SWK), 2000 U.S. Dist. LEXIS 12775, at *11 (S.D.N.Y. Sept. 5, 2000)); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (a *pro se* complaint is to be read liberally and held to "less stringent standards" than formal pleadings drafted by lawyers); *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006).  "The court should not dismiss [a *pro se* pleading] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Gomez v. USAA Federal Savings Bank*, 171 F.3d 794, 795-96 (2d Cir. 1999) (district court must afford a *pro se* plaintiff the opportunity to amend the complaint before dismissal where that amendment could result in successful pleading of claim (quotation omitted)).

Nonetheless, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire*, *LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (citation omitted); *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002).  In addition, even plaintiffs who are proceeding *pro se* must comply with any relevant procedural and substantive rules, and, to survive a motion to dismiss, a *pro se* complaint, like any other complaint, must plead enough facts "'to state a

claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009)

(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Bisson v. Martin Luther*

*King Jr. Health Clinic*, No. 07-5416, 2008 U.S. App. LEXIS 23977, at *2 (2d Cir. Nov. 20,

2008).  In other words, a plaintiff is required to amplify a claim with some factual allegations so

as to allow the Court to draw the reasonable inference that the defendant is liable for the alleged

conduct.  *Iqbal*, 129 S. Ct. at 1949.

## II.      DEFENDANTS' MOTION

### A.      Rule 12(b)(2) Motion To Dismiss for Lack of Personal Jurisdiction

All Defendants except the LTD move to dismiss for lack of personal jurisdiction under

Fed. R. Civ. P. 12(b)(2).  (Reply Memorandum of Law In Further Support of Motion to Dismiss

Or In the Alternative Transfer to the District of Colorado, dated Nov. 9, 2007 ("Pl. Reply

Mem.") (Dkt. 33), at 2 ("this Court lacks jurisdiction over all Defendants except for Reed

Group").)  Defendants' motion should be granted with respect to Nagel, and denied with respect

to all other defendants.

#### 1.      The LLC

As noted above, it is undisputed that the Court has jurisdiction over the LTD in this

matter.  Plaintiff appears to argue that the Court has jurisdiction over the LLC because the LLC

was, for at least a time, the LTD's successor in interest.  In particular, Plaintiff contends that the

LLC conducted business nationally and in New York State during 2005 under the name Reed

Group, during which time the LTD did not exist or operate.  (Am. Compl. at ¶¶ 62-63.)

Under New York law, a successor in interest is subject to jurisdiction based on the

activities of its predecessor if "the predecessor and successor [were] one and the same and . . .

the predecessor continue[d] to exist as part of the successor."  *Linzer v. EMI Blackwood Music*,

904 F. Supp. 207, 213 (S.D.N.Y. 1995).  Here, Plaintiff alleges that the LLC was "designed to be the successor to Reed Group, LTD" (Phillips Decl. at ¶ 4; Am. Compl. at ¶ 3), and that the LLC was the only company that existed as the "Reed Group" in all of 2005 (Am. Compl. at ¶ 63). Essentially, Plaintiff alleges that the LTD was dissolved and its operations were continued, at least temporarily, under the name Reed Group LLC.  (Am. Compl. at ¶¶ 62-63.)  Plaintiff's Amended Complaint further describes the formation of the LLC, its press releases, and its board meetings.  (*See* Am. Compl. at ¶¶ 56-68.)  In addition, Plaintiff has submitted the following evidence in opposition to the pending motion:

- an August 2004 memorandum from Casart to Reed, Grace and the LTD recommending that Mr. Reed and Grace "form a new LLC, into which [the LTD's] existing business assets and the Reeds' intellectual property rights are contributed" (Pl. Mem., Ex. A);

- a declaration from Thomas Williams, allegedly a member of the Reed Group Board of Directors from August 2004 until October 2006, in which Reed told him "the name and form of the company was being changed to Reed Group LLC" (Declaration of Thomas Williams, dated Aug. 7, 2007, at ¶ 3); and

- a declaration from the former CEO of the Reed Group which states that "[t]he LLC was an effort to consolidate the value of the [Reed Group] company . . . .  The new entity was named Reed Group LLC . . . [and] was created in January 2005" (Moran Decl. at ¶¶ 8-11).

Plaintiff's allegations and the above evidence are sufficient to establish, at this stage in the proceedings, that the LLC operated as the successor to the LTD during a portion of the relevant

time period.[11]  Defendants' motion to dismiss the claims against the LLC for lack of personal jurisdiction should therefore be denied.

## 2.  <u>Nagel</u>

It is undisputed that Nagel resides in Colorado, is licensed to practice law there, and is outside counsel to both the LTD and the LLC.  Plaintiff does not allege that Nagel conducts business on a regular basis in New York, either on an individual basis or as an agent of the defendant companies.  Therefore, Plaintiff does not allege that Nagel has a presence in New York sufficient to confer general jurisdiction.

Plaintiff's sole argument as to why this Court may exercise personal jurisdiction over Nagel is that defendants LTD, Reed, and Grace "have acted as *agents of Nagel* in New York and therefore have subjected him to jurisdiction in this case since he is a Trustee of the Trust that owns [30% of the LTD]."  (Am. Compl. at ¶ 13 n.3 (emphasis added); *see id.* at ¶ 7.)  Plaintiff, however, fails to allege facts sufficient to support his legal conclusion that other defendants have acted as agents of Nagel in New York.  Certainly, Nagel's mere status as an alleged "trustee" of an entity that owns a stake in the LTD is insufficient to suggest that the LTD or others acted in New York at Nagel's direction and control.  *See National Petrochemical Co. v. The M/T Stolt Sheaf*, 930 F.2d 240, 244 (2d Cir. 1991) ("[t]he crucial element of an agency relationship . . . is that the agent acts subject to the principal's direction and control" (internal quotation marks and citation omitted)).  As Plaintiff has failed to plead facts or introduce evidence sufficient to support his bare allegations regarding the role of other defendants as Nagel's "agents," he has

---

[11] It would be particularly inappropriate to dismiss Plaintiff's claims agains the LLC on jurisdictional grounds, where Defendants have contributed to confusion as to the continued operation of the LTD by issuing press releases that fail to make clear the corporate identity of the so-called "Reed Group."  (*See* n.6, *supra*.)

failed to demonstrate a basis for this Court's exercise of personal jurisdiction over this defendant.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Jazini*, 148 F.3d at 185 (the court is "not bound to accept as true a legal conclusion couched as a factual allegation").

Accordingly, Plaintiff's Amended Complaint, as currently pleaded, is insufficient to support this Court's exercise of personal jurisdiction over Nagel.  Further, while, as noted above, the Court should not dismiss a *pro se* complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez*, 171 F.3d at 795-96 (2d Cir. 1999), in this instance, Plaintiff has already amended his original Complaint once, after being faced with an initial motion to dismiss in which, *inter alia,* Nagel raised the same arguments regarding lack of personal jurisdiction as he raises here.  (*See* untitled memorandum of law, dated July 25, 2007 ("Def. Init. Mem.") (Dkt. 11), at 12.)  For this reason, and as Plaintiff's Amended Complaint does not give "any indication" that the Court might have jurisdiction over Nagel, I recommend that Plaintiff's claims against this defendant be dismissed.

### 3.     <u>Reed and Grace</u>

Plaintiff contends that this Court has personal jurisdiction over Reed and Grace on three alternative grounds:  (1) general jurisdiction based on the fact that they "do business" in New York; (2) specific jurisdiction based on their alleged performance, in New York, of specific acts that gave rise to Plaintiff's claims; and (3) jurisdiction based on the piercing of the LTD's corporate veil.

### a.     <u>General Jurisdiction under N.Y.C.P.L.R. § 301</u>

It appears that, absent any piercing of the corporate veil, defendants Reed and Grace would not have sufficient "presence" in New York State to give rise to general jurisdiction under

Section 301 of the New York Civil Practice Law and Rules.  Plaintiff asserts that these defendants reside in Colorado and are not New York domiciliaries (Am. Compl. at ¶¶ 4, 5; *see also* 9/26/07 Nagel Decl. At ¶ 7), and does not allege that they own any property in New York. To the extent Plaintiff's allegations suggest that Reed and Grace have performed services for the LTD in New York, this would not be the equivalent of their having engaged in their own "continuous and systematic course of doing business" in the state, sufficient to warrant a finding of their personal "presence" in the state.  *McGowan v. Smith*, 52 N.Y.2d 268, 272 (1981). Similarly, to the extent Plaintiff alleges that these defendants solicited business in New York for the LTD (*see, e.g.,* Am. Compl. ¶ 11(e)(iii)), this could not satisfy the "solicitation-plus" standard for the Court's exercise of jurisdiction over them, personally.  As Defendants correctly point out, individuals cannot be subject to general jurisdiction under Section 301 unless they are doing business in New York on their own behalf, rather than on behalf of a corporation.  (*See* Def. Mem. at 14 (citing *Brinkmann v. Adrian Carriers, Inc.*, 815 N.Y.S.2d 196, 199 (2d Dep't 2006)).)

### b. Specific Jurisdiction under N.Y.C.P.L.R. § 302(a)

Section 302(a) establishes "personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . .  transacts any business within [New York] state."  N.Y.C.P.L.R. § 302(a).  The New York Court of Appeals has made clear that Section 302 confers jurisdiction over "an individual who was a primary actor in [a] transaction . . . in New York," even if that individual was acting as a corporation's agent.  *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 470 (1988).  To establish jurisdiction under Section 302, the plaintiff must demonstrate "the existence of some articulable nexus between the business transacted and the cause of action sued upon."  *McGowan*, 52 N.Y.2d at 272.  This Court has held that a meeting in New York must be

27

"essential to the formation or continuance of a business relationship" in order to give rise to personal jurisdiction under Section 302. *NCA Holding Corp. v. Ernestus*, No. 97 Civ. 1372 (LMM), 1998 U.S. Dist. LEXIS 10298, at *11-12 (S.D.N.Y. July 13, 1998) (cited at Def. Mem. at 16). A meeting in New York may be insufficient to establish jurisdiction if the meeting was merely "exploratory, unproductive, or insubstantial." *Id.*

Plaintiff has failed to allege any specific conduct by Grace that could give rise to jurisdiction over her, under Section 302. Plaintiff alleges that Grace has transacted business in New York, through extensive travel to present sales, attending trade shows, and conducting a seminar to reach a local New York market. (*See* Am. Compl. at ¶¶ 11(e)(iii), 11(e)(I).) These transactions, through, even assuming they occurred, are not sufficient to give rise to specific jurisdiction pursuant to Section 302(a) because Plaintiff has not alleged the existence of any "nexus" between Grace's alleged New York-based transactions and Plaintiff's causes of action. *See McGowan*, 52 N.Y.2d at 272. Plaintiff's conclusory allegation that Grace, together with Reed and the LTD, have all "transacted business within [New York] and the claim asserted by [Plaintiff] arises from that business activity" (Am. Compl. at ¶ 13(b)) is insufficient to establish such a nexus. *See Jazini*, 148 F.3d at 185.

As to Reed, Plaintiff contends that two alleged meetings that he had with Reed, in New York, give rise to specific jurisdiction over Reed. According to Plaintiff, he and Reed reached key agreements at these meetings, and those agreements underlie Plaintiff's claims. (Pl. Mem. at 17-18.) Plaintiff alleges that, in the first meeting, he told Reed about Plaintiff's "over[]all expectation that under normal circumstances [Plaintiff] expected" a three percent equity interest, and Reed "agreed these amounts were reasonable and suggested [they] proceed." (Am. Compl. at ¶ 11(I).) The Court notes, however, that this purported agreement appears to have been

28

superceded by the ensuing writing allegedly given to Plaintiff by Reed and "accepted" by

Plaintiff; that writing described a two percent equity interest for Plaintiff, not a three percent

interest.  (*See* Am. Compl. at ¶ 77.)  With respect to the second meeting that allegedly gives rise

to jurisdiction, Plaintiff merely alleges that he met with Reed in New York in May 2005 and the

two "discussed the ACOEM UMK Joint Venture."  (Am. Compl. at ¶ 12(j).)  Plaintiff does not

assert that any particular terms of the alleged joint venture were mentioned during that meeting

(*see id.*), but rather alleges that in *other* discussions with Reed, Phillips set forth his proposal that

Plaintiff receive 15 percent of the value of the product and an "appropriate" portion of the

revenue (*see id.*).

It is a close question whether either of the two alleged meetings were sufficiently

"essential" to the formation or continuation of the parties' business relationship to support

jurisdiction over Reed, under Section 302.  *Cf. United States Theatre Corp. v.*

*Gunwyn/Lansburgh Ltd. Partnership*, 825 F. Supp. 594, 596 (S.D.N.Y. 1993) (where a meeting

in New York "is not for the purpose of initiating or forming a relationship, but is to alleviate

problems under a pre-existing relationship, New York courts have declined to assert

jurisdiction").  The Court need not decide this question, however, because the exercise of

jurisdiction over both Reed and Grace would be proper at this stage in the litigation for the

separate reasons set forth below.

### c.      Piercing the Corporate Veil

Plaintiff also argues that the Court should pierce the corporate veil to exercise

jurisdiction over both Reed and Grace.  (*See* Am. Compl. at 44-46.)  In addition to alleging

generally that Reed and Grace, in their business dealings, acted "in their own personal interest

rather than in the best interest of [the LTD] (Am. Compl. at ¶ 16(a) (emphasis omitted), Plaintiff

has made specific, plausible allegations that Reed and Grace together created a "shell" LLC in order to induce numerous individuals to work for free for the LTD. Plaintiff further alleges that both of these defendants personally benefitted from this conduct because the value of the MDA – which, according to Plaintiff, they personally own, but commingle with the LTD's assets – was significantly strengthened by Plaintiff's uncompensated work for the LTD.

In this instance, Plaintiff has met has his burden of making a threshold showing of jurisdiction over Reed and Grace. *See Marine Midland Bank*, 664 F.2d at 904. Assuming the truth of Plaintiff's allegation that Reed and Grace created a shell LLC to induce Plaintiff to work for free for their personal benefit, this would be a "manifest abuse of the corporate form." *Walk-In Medical Centers, Inc. v. Breuer Capital Corp.*, 778 F. Supp. 1116, 1123 (D. Colo. 1991). Defendants have failed to offer any legitimate reason why it would be improper for the Court to exercise personal jurisdiction over Reed and Grace on this ground. (*See* Def. Mem. at 22-24.) Beyond disputing Plaintiff's factual allegations – primarily via statements that are not in admissible form, such as statements made in legal briefs and unsworn declarations from defendant Nagel (*see* n.3, *supra*) – Defendants have offered only one specific legal argument against veil piercing in this case: that the LTD's adequate capitalization is sufficient to defeat any effort to pierce the corporate veil. (*See* Def. Mem. at 23 (citing *Straub v. Mountain Trails Resort*, Inc., 770 P.2d 1321 (Colo. Ct. App. 1988).) Defendants' argument fails to account for the fact that the LLC admittedly has no assets at all. (Def. Mem. at 4 (stating that the LLC has "never had any of its own assets"); *see also* Compl., ¶ 176 (alleging, upon information and belief, that the LLC "had few, if any[,] assets, clients, revenue or officers").) Furthermore, under Colorado law, adequate capitalization is only one of many factors in the veil-piercing analysis.

30

*See Phillips v. Englewood Post*, 139 P.3d at 644 (listing eight factors that courts consider when determining whether to treat a corporation and its shareholder as alter egos).

With respect to Plaintiff's factual allegations, Defendants flatly deny that Reed and Grace personally owned the MDA during the relevant time period.  (*See* Def. Mem. at 23.)  Although Defendants may ultimately be able to prevail on this question of fact, it would be improvident for the Court to grant a Rule 12 motion where such questions of fact still exist.  Plaintiff has submitted sufficient evidence to render plausible his allegations about Reed and Grace's purported ownership.  In particular, Plaintiff has submitted an August 27, 2004 memorandum from Casart to the LTD, Reed, and Grace, which discusses the possibility of forming an LLC.  In this memorandum, as noted above, Casart explains that "[i]n the summer of 2003, the Reeds [Reed and Grace] were given . . . all of the intellectual property associated with the disability guidelines business," and further notes that, as of the date of the memorandum, "the intellectual property rights to the guidelines remain the property of the Reeds, personally."  (Pl. Mem., Ex. A.)  Defendants fail to address this evidence.

In sum, Plaintiff, proceeding *pro se*, has made plausible allegations that Reed and Grace created a shell LLC to induce him to work for an "equity" interest in that shell, and that Reed and Grace commingled their property with the LTD's in order to benefit themselves personally. Defendants have essentially failed to argue that such conduct is insufficient to warrant the piercing of the corporate veil, but rather have merely disputed Plaintiff's factual allegations. Defendants' motion to dismiss the claims against Reed and Grace on jurisdictional grounds should therefore be denied.

31

**B.** **Rule 12(b)(3) Motion To Dismiss for Improper Venue**

Defendants argue that this case should be dismissed for "lack of venue" because Plaintiff has failed to meet the venue requirements of 28 U.S.C. § 1391(a).  (Def. Mem. at 2, 18-19.) Under Section 1391, a diversity case may be brought only in "(1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought."  28 U.S.C. § 1391(a).

Defendants' argument fails because Section 1391 does not apply to cases that have been removed from state court. *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 72 (2d Cir. 1998) ("the removal statute, and not the ordinary federal venue statute, 28 U.S.C.A. § 1391 . . ., governs venue in removed cases") (citing *Polizzi v. Cowles Magazines, Inc.*, 345 U.S. 663, 665-66 (1953)); *accord*, *AIG Fin. Prods.*, 675 F. Supp. 2d at 367.  Venue in cases that have been removed from state court are governed by 28 U.S.C. § 1441(a), which provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."  Since this Court's district embraces the state court where this action was originally filed (*see* Dkt. 1 (action removed from Supreme Court of the State of New York, New York County)), venue is proper in this district under Section 1441(a), *see AIG Fin. Prods.*, 675 F.

Supp. 2d at 366.[12]  Defendants' motion to dismiss for improper venue should therefore be denied.

### C.  Motion To Dismiss or Transfer Under 28 U.S.C. § 1406

Defendants have also moved to dismiss the action, or in the alternative to transfer the action to Colorado, under 28 U.S.C. § 1406.  Section 1406 provides for dismissal or transfer of an action that is pending in "the wrong division or district."  Because venue in the Southern District of New York is proper under Section 1441 for the reasons noted above, this action cannot be dismissed or transferred pursuant to Section 1406.  *See Licensed Practical Nurses, Technicians & Healthcare Workers of N.Y., Inc. v. Ulysses Cruises, Inc.*, 131 F. Supp. 2d 393, 405 (S.D.N.Y. 2000).

### D.  Motion To Transfer Under 28 U.S.C. § 1404

Defendants have also asked the Court to transfer this matter to the District of Colorado pursuant to 28 U.S.C. § 1404(a).  Section 1404(a) allows an action to be transferred to another district where that action might have been brought, "[f]or the convenience of parties and witnesses, in the interest of justice."  It is clear that Plaintiff could have brought this suit in the District of Colorado:  many of the actions giving rise to the suit occurred in Colorado, and all the Defendants are Colorado residents.  *See* 28 U.S.C. § 1391(a)(1).  Transfer is only appropriate, however, if the Defendants have shown by clear and convincing evidence that convenience and justice favors a transfer.  *New York Marine & Gen. Ins. Co.*, 599 F.3d at 114.  In making this determination, the Court should consider a number of factors, including:  (1) the convenience of

---

[12] The Court need not address whether venue was proper in the underlying state court action, as Defendants have not raised that issue in their motion papers.  *Cf. PT United*, 138 F.3d at 72 ("[a] party who removes an action from state to federal court does not, in so doing, waive the defense of improper venue as to the underlying state court action").

witnesses; (2) the convenience of the parties; (3) the locus of operative facts; (4) the availability of process to compel the attendance of unwilling witnesses; (5) the location of relevant documents and the relative ease of access to sources of proof; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded to plaintiff's choice of forum; (9) trial efficiency; and (10) the interest of justice, based on the totality of the circumstances. *DealTime.com, Ltd. v. McNulty*, 123 F. Supp. 2d 750, 755 (S.D.N.Y. 2000).

Some of these factors favor are neutral in this case. The locus of operative facts is so heavily disputed by the parties that it cannot be said to favor either party. (*Compare* 9/26/07 Nagel Decl. at ¶¶ 16-17 (stating that Plaintiff was in Colorado for 74 days and in New York for 12 days during the relevant time period) *with* Phillips Decl. at ¶ 2 (stating that Plaintiff was in New York for more days than he was in Colorado).) Likewise, the availability of compulsory process of witnesses is a neutral factor because neither party has identified any witnesses who would be unwilling to testify without compulsion. *See AIG Fin. Prods.*, 675 F. Supp. 2d at 371 (citing *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 562 (S.D.N.Y. 2000)). Further, as Plaintiff correctly argues, the location of relevant documents and sources of proof is a minimal consideration in today's age of electronic communication, *see Am. S.S. Owners Mut. Prot. & Indem. Ass'n v. LaFarge N. Am., Inc.*, 474 F. Supp. 2d 474, 484 (S.D.N.Y. 2007) ("[t]he location of relevant documents is largely a neutral factor in today's world of faxing, scanning, and emailing documents") (cited in Pl. Mem. at 24), and Defendants have provided no persuasive reason to give that factor any weight here. On balance, neither trial efficiency nor the interests of justice particularly favor or disfavor a transfer. (*See* Def. Reply Mem. at 7 (conceding that civil litigations in this district are resolved, on average, a week or two faster than cases in the District of Colorado).)

Of the remaining factors, two favor Defendants:  the convenience of anticipated witnesses, and the governing law.  Plaintiff states that he plans to call seven witnesses, all New York residents (*see* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint, dated Oct. 26, 2007 ("Pl. Mem.") (Dkt. 32), at 21), while Defendants state that they would call 19 non-party witnesses, all of whom reside in Colorado (*see* 11/8/07 Nagel Decl. at ¶ 11).  Because more witnesses reside in Colorado, this factor weighs in favor of transfer.  To the extent that Colorado substantive law may govern this action (see *infra* at § E(1)), that consideration also favors a transfer, but only slightly.  *See Sills v. Ronald Reagan Presidential Found.*, No. 09 Civ. 1188 (GEL), 2009 U.S. Dist. LEXIS 44774, at *34 (S.D.N.Y. May 27, 2009) ("[t]he forum's familiarity with governing law is typically given little weight by federal courts" (citation omitted)).[13]

Three factors, however, favor Plaintiff:  the convenience of the forum to the parties, the relative means of the parties, and the Plaintiff's choice of forum.  Although Plaintiff resides thousands of miles from Colorado and Defendants reside thousands of miles from New York, the LTD maintains a significant presence in New York State and it appears that Grace and Reed both travel to New York City on business.  (*See* Pl. Mem. at 24 (arguing that Reed and Grace "have extensive clients and operations that require their presence [in New York]"; Am. Compl. at ¶¶ 11(e), 11(f), 12.  In addition, Defendants have retained New York City counsel, which should limit the number of trips to this district that Defendants would have to make personally.  Plaintiff also asserts that he is self-employed and without a regular source of income, and he has

---

[13] *But see Laumann Mfg. Corp. v. Castings USA*, 913 F. Supp. 712, 722 (E.D.N.Y. 1996) ("'there is an appropriateness . . . in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself'" (quoting *Van Dusen v. Barrack*, 376 U.S. 612 (1964)).

stated that when he travels to New York City, he is able to stay with family to reduce his expenses.  (Pl. Mem. at 25.)  Whereas he states that it would be "prohibitively expensive" for him to litigate this case in Colorado (*id.*), Defendants appear to have sufficient resources to litigate in this district.  Thus, both the convenience and relative means of the parties weigh against transfer.  Finally, the fact that plaintiff has chosen this forum weighs against transfer, though not significantly.  In general, the plaintiff's choice of forum should only be disturbed if the balance of factors weighs heavily in favor of a transfer.  *Seagoing Uniform Corp. v. Texaco, Inc.*, 705 F. Supp. 918, 936 (S.D.N.Y. 1989).  The plaintiff's choice of forum is accorded less deference, however, where the plaintiff does not reside in the chosen forum and the lawsuit's operative facts did not all occur in the chosen forum.  *See Dwyer v. General Motors Corp.*, 853 F. Supp. 690, 694 (S.D.N.Y. 1994).  Here, Plaintiff is a Massachusetts (not a New York) resident, and many of the operative facts occurred outside this district.  This final factor thus weighs only slightly against transfer.

Based on the totality of the circumstances, the motion to transfer should be denied.  The Defendants have failed to meet their burden of "establishing the propriety of transfer by a clear and convincing showing."  *Excelsior Designs, Inc. v. Sheres*, 291 F. Supp. 2d 181, 185 (E.D.N.Y. 2003).  As this Court has observed, "the convenience of the parties and witnesses is generally considered the 'most significant factor'" in evaluating a motion to transfer.  *Deutsche Babcock Aktiengesellschaft v. Babcock & Wilcox Co.*, No. 97 Civ. 7544 (DAB), 1998 U.S. Dist. LEXIS 17275, at *5-6 (S.D.N.Y. Nov. 3, 1998).  Here, although some Colorado-based witnesses would be inconvenienced if the case were to remain in this district, it is undisputed that there are New York-based witnesses with relevant knowledge who would be inconvenienced if the litigation were transferred to Colorado.  (*See* Def. Reply Mem. at 6 (contesting the residence, or

relevance of the likely testimony, of only certain of Plaintiff's seven proposed witnesses).)  In such a situation, this Court is persuaded that the significant disparity in the parties' apparent means, together with the inconvenience that Plaintiff would suffer if this case were transferred to Colorado, renders a transfer inappropriate.

Accordingly, I recommend that Defendants' motion to transfer be denied.

### E.        Rule 12(b)(6) Motion To Dismiss for Failure to State a Claim

Plaintiff asserts claims for breach of contract, negligent misrepresentation, quantum meruit, promissory estoppel, breach of fiduciary duty, and unjust enrichment.  The Amended Complaint is at times unclear as to which Defendants are the subject of particular factual allegations and legal claims.  (*See, e.g.*, Am. Compl. at ¶ 11(d)(2) (describing the website of ambiguous "Defendant"); *id.* at 48.)  Construed liberally, however, Plaintiff's allegations suggest that all or nearly all of the alleged conduct was performed by the LTD, by its alleged successor the LLC, and/or by individual defendants acting as corporate officers of the LTD or LLC.  Such a reading of the Amended Complaint is consistent with Defendants' position that the individual defendants' alleged conduct was in fact "action[] taken as corporate officers."  (Def. Mem. at 23.)  Thus, this Court construes Plaintiff's claims to be pleaded as against the LTD.  As discussed below, however, the claims that Plaintiff has adequately pleaded against the LTD also represent – at least at this stage in the litigation – viable claims as against the LLC, Reed, and Grace.

### 1.    Choice of Law Governing Plaintiff's Substantive Claims[14]

Defendants argue that Colorado law governs Plaintiff's claims.  (Def. Mem. at 22.)
Plaintiff believes that New York law should apply.  (*See* Pl. Mem. at 28-30 (citing only New
York law to support the merits of Plaintiff's claims).)  As Defendants correctly point out, there
are actual conflicts between New York and Colorado law with respect to at least some of
Plaintiff's substantive claims.  (*See, e.g.*, Def. Mem. at 25 n.22 (noting different privity standards
under New York and Colorado law for negligent representation claims seeking only monetary
damages); *id.* at 27 n.25 (noting different elements for promissory estoppel claims under New
York and Colorado law).)  The Court must therefore decide whether New York or Colorado law
applies to Plaintiff's claims.[15]

### a.    Contract and Quasi-Contract Claims

Under New York choice of law principles, which apply in this diversity action (see *supra*
n.9), the choice of law for contract and quasi-contract claims is determined by a "center of
gravity" analysis.  *See Globalnet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 383
(2d Cir. 2006); *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 394 (2d Cir. 2001).  This
analysis determines the contract's "center of gravity" by examining "'the place of contracting,
negotiation and performance; the location of the subject matter of the contract; and the domicile
of the contracting parties.'"  *Globalnet Financial.com, Inc.*, 449 F.3d at 383 (quoting *Allstate
Ins. Co. v. Stolarz*, 81 N.Y.2d 219, 227 (1993)).  The only one of these factors that remotely

---

[14] As discussed above, personal jurisdiction in this action is governed by New York law
(*see* Discussion *supra*, at Point I(A)), and whether the corporate veil should be pierced is
determined by Colorado law (*see id.* at Point I(B)).

[15] Neither party argues that the law of Massachusetts (Plaintiff's domicile) applies.
Therefore the Court's choice of law analysis will consider only New York and Colorado law.
*See Schultz v. Boy Scouts of Am.*, 65 N.Y.2d 189, 195 (1985).

favors the application of New York law is the location of the alleged contract negotiations, as Plaintiff alleges that at least some portions of those negotiations occurred in New York. The remaining factors are all either neutral or favor the application of Colorado law over New York law. Although Plaintiff states that he worked more in New York than in Colorado, he does not contest Defendants' assertion that, to the extent his work was related to the alleged contracts, he performed most of the work from his home, in Massachusetts. (*See* Phillips Decl., Ex. U; 9/26/07 Nagel Decl. at ¶¶ 2(c), 32; Def. Reply Mem. at 6.) The allegedly property at issue in the contracts – an equity interest in a Colorado corporation, and a stake in a joint venture between Colorado and Massachusetts residents – is certainly more firmly centered in Colorado than in New York. Finally, Colorado residents, but not New York residents, are allegedly parties to the contracts. As such, the "center of gravity" of the alleged contracts is in Colorado, not New York, and Colorado law therefore governs Plaintiff's claims for breach of contract, quantum meruit, promissory estoppel, and unjust enrichment. *See, e.g., Fieger*, 251 F.3d at 394 (applying "center of gravity" analysis to quantum meruit claim because that claim "sounds more in contract than in tort").

### b.   Tort Claims

The choice of law for Plaintiff's negligent misrepresentation claim is somewhat unclear because the Amended Complaint does not indicate where the relevant alleged misrepresentations occurred. Under New York choice of law principles, "'the law of the jurisdiction having the greatest interest in the litigation will be applied'" to tort claims, *Globalnet Financial.com, Inc.*, 449 F.3d at 383 (quoting *Schultz*, 65 N.Y.2d at 197), and, under this inquiry, the significant factors are "almost exclusively[] the parties' domiciles and the locus of the tort," *Schultz*, 65 N.Y.2d at 197 (citations and alterations omitted). Without sufficient details in the Amended

Complaint to permit the Court to determine the "locus" of the alleged misrepresentations – that is, where those alleged misrepresentations were made – the Court cannot determine what law should apply.  As explained below, however, the Amended Complaint's lack of specificity regarding the alleged misrepresentations renders his negligent misrepresentation claim defective, in any event, under Rule 9 of the Federal Rules of Civil Procedure.  Accordingly, the choice of law question as to this claim should be deferred until such time as Plaintiff repleads to satisfy the Rule 9 requirements.

Plaintiff's breach of fiduciary duty claim is governed by Colorado law.  Plaintiff contends, in essence, that Defendants breached their fiduciary duty to him by failing to disclose vital information such as the LLC's true operational status and Reed and Grace's ownership of the MDA.  (Am. Compl. at 53, ¶¶ 1-7.)   This claim implicates significant questions about the duties and obligations of the directors and officers of Colorado corporate entities and, under New York choice-of-law principles, "courts look to the law of the state of incorporation in adjudicating a corporation's internal affairs, including questions as to the relationship between the corporation's shareholders and its directors."  *Seidl v. Am. Century Cos.*, No. 08 Civ. 8857 (DLC), 2010 U.S. Dist. LEXIS 45060, at *10-11 (S.D.N.Y. May 7, 2010) (quoting *Galef v. Alexander*, 615 F.2d 51, 58 (2d Cir. 1980) (internal quotation marks omitted)).[16]

---

[16] A traditional choice of law analysis, which, as noted above, focuses "almost exclusively[] the parties' domiciles and the locus of the tort," *Schultz*, 65 N.Y.2d at 197, yields the same conclusion.  Although Plaintiff points to a few specific instances of allegedly misleading interactions in New York, he does not contest Defendants' assertion that the bulk of Defendants' pertinent activity was conducted in Colorado.  (*See* Def. Mem. at 2-6.)  Because the alleged wrongful conduct – *i.e.,* a failure to be sufficiently forthcoming about key facts – was committed by Colorado residents who appear to have been acting primarily in Colorado, Colorado law should apply.

2.      **Claims Against the LTD**

a.      **Breach of Contract**

In arguing for dismissal of Plaintiff's contract claim, Defendants argue that there was no enforceable contract because the parties' unsigned written agreement was not finalized, was marked "DRAFT," failed to address "two key financial components," and, by its own terms, required its execution and adoption in order for it to take effect.  (Def. Mem. at 24-25.) Defendants essentially contend that (1) there was no requisite "meeting of the minds" regarding key contract terms, and (2) regardless, the written agreement had to be signed in order to give rise to a contract.  (*Id.* at 24.)  At this stage, both arguments fail.

Plaintiff has adequately alleged a meeting of the minds regarding his equity share in the LLC.  Plaintiff alleges that Reed and Plaintiff discussed a three percent equity interest, as "reasonable" compensation for Plaintiff's services.  (Am. Compl. at ¶ 12(i).)  Plaintiff further alleges that, sometime after that discussion, Reed sent Plaintiff a proposed LLC operating agreement under which Plaintiff would receive a two percent ownership interest, and that Plaintiff "accepted" that agreement.  (*See* Am. Compl. at ¶ 25; *id.* at 48, ¶ 4; Pl. Mem. at 5.) Defendants argue that this cannot give rise to the requisite meeting of the minds because the draft operating agreement was silent regarding other "key financial components" of the LLC's operations – namely, the equity shares and capital contributions of *other* individuals involved. (Def. Mem. at 24.)  Yet, to the extent that such information was missing from the agreement, those terms were not essential to any meeting of the minds between Plaintiff and Defendants about *Plaintiff*'s equity interest and capital contribution amount, which were plainly set forth in the written agreement allegedly sent from Reed to Plaintiff.  (*See* Am. Compl., Ex. A, at Schedule A (listing Plaintiff's "Capital Contribution" amount as $0.00 and his "Profits Interest"

41

as 2.00 Percent).)  Plaintiff has thus alleged sufficient facts to support a meeting of the minds

regarding his purported equity interest.

Defendants also argue that there can be no contract because the written agreement was

never signed.  The sole Colorado decision relied upon by Defendants, however, makes clear that

a signed agreement is not necessary as long as there is a meeting of the minds regarding the

contract's terms.  *See In re Marriage of O'Brien*, 759 P.2d 826, 828 (Ct. App. Colo. 1988) ("the

minds of the parties must have met and the terms must be sufficiently definite in order for a

contract to come into existence").[17]  Simply put, Defendants have failed to set forth any legally

sound reason why, in this case, the absence of a signed writing forecloses the formation of the

contract as a matter of law.

Defendants further argue that there was no contract because, "if the parties do not intend

be bound by an agreement until it is in writing and signed, then there is no contract until that

event occurs."  (Def. Mem. at 25 (quoting *R.G. Group v. Horn & Hardart Co.*, 751 F.2d 69, 74

(2d Cir. 1984).)  This argument fails because it requires the Court to assume that the Defendants

never intended to enter into an agreement with Plaintiff about his equity interest before the

formal LLC agreement was signed.  Whether Defendants actually harbored such an intention is

an issue of fact that cannot be resolved on a motion to dismiss.

Accordingly, Defendants' motion to dismiss the breach of contract claim should be

denied.

---

[17] Defendants have not specifically raised a statute of frauds defense in their motion to dismiss.  Although Colorado's statute of frauds voids any unsigned agreement "that by the terms is not to be performed within one year after the making thereof," Colo. Rev. Stat. § 38-10-112 (2010), no argument has been made here as to whether the alleged agreement would be unenforceable under that provision, and the Court should not *sua sponte* consider a defense that Defendants have not asserted.

**b.**   <u>**Negligent Misrepresentation**</u>

In their initial brief, Defendants argue that Plaintiff's negligent representation claim

should be dismissed because (1) it is barred by the so-called "economic loss" rule,[18] or,

alternatively, (2) the Defendants' alleged representations concerned only future expectations and

not present facts.  (Def. Mem. at 25.)  In their reply brief, Defendants also argue that Plaintiff did

not plead his negligent misrepresentation claim with the required specificity.  (Def. Reply Mem.

at 8.)[19]

As a threshold matter, a state-law negligent misrepresentation claim is subject to the

enhanced pleading requirements of Federal Rule of Civil Procedure 9(b).  *Gunningham v. Std.*

*Fire Ins. Co.*, No. 07-cv-02538-REB-KLM, 2008 U.S. Dist. LEXIS 82044, at *3 (D. Colo.

Sept. 19, 2008); *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 495 (S.D.N.Y.

2006) ("Negligent misrepresentation claims must be pleaded with particularity pursuant to Rule

9(b)").  Under this enhanced pleading standard (a matter of federal procedural law), the plaintiff

must – at the very least – allege the particular time, place, and speaker.  *See Gunningham*, 2008

U.S. Dist. LEXIS 82044, at *3 (citing *Schwartz v. Celestial Seasonings, Inc.,* 124 F.3d 1246,

1252 (10th Cir. 1997)); *General Ins. Co. of Am. v. K. Capolino Constr. Corp.*, 957 F. Supp. 457,

463-64 (S.D.N.Y. 1996); *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001).  Furthermore,

---

[18] Under Colorado law's economic loss rule, "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law."  *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 72 (Colo. 2004) (internal quotation marks and citation omitted).  Whereas New York's economic loss rule, however, applies only in products liability actions, *see Travelers Cas. & Sur. Co. v. Dormitory Auth.*, 07 Civ. 6915 (DLC), 2010 U.S. Dist. LEXIS 82368, *14-16 n.1 (S.D.N.Y. Aug. 11, 2010) (citing *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 289 (2001)), Colorado law is not so limited.

[19] The Court accepted a sur-reply from Plaintiff addressing new arguments raised by Defendants on reply.  (*See* Dkt. 35.)

to be actionable, the alleged misrepresentation must be a false statement about a present fact, not a future expectation or promise.  *Branscum v. American Community Mutual Ins. Co.*, 984 P.2d 675, 680 (Ct. App. Colo. 1999) ("A claim for negligent misrepresentation applies only if there has been a misrepresentation of an existing fact."); *Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 21 (2d Cir. 2000).  While the pleadings of a *pro se* plaintiff must be construed liberally, a *pro se* complaint must still meet the particularity requirements of Rule 9(b).  *See Hoffenberg v. Hoffman & Pollok*, 248 F. Supp. 2d 303, 310-11 (S.D.N.Y. 2003).

Here, Plaintiff has failed to allege any false statements of present fact with the requisite particularity.  While Plaintiff alleges, for example, that, on March 31, 2005, Reed presented him with an unsigned LLC operating agreement and stated, "we may have already accomplished our goals" (Am. Compl. at ¶ 25), neither the unsigned agreement nor Reed's alleged statement on that date can be said to contain a specific misrepresentation.  Likewise insufficient are Plaintiff's allegations that:

> (1)  Defendants made representations "that the LLC existed and that it was to be the successor [to the LTD]" (Am. Compl. at 50, ¶ 6(a));
>
> (2)  Defendants made representations "that [Plaintiff] was an economic member of LLC and that LLC would have actual financial value as the assets and function of [the LTD] were transferred to LLC" (*id.* at 50, ¶ 6(b));
>
> (3)  Reed remarked to Plaintiff, "You are an owner" (*id.* at 49, ¶ 5); and Reed "held the fact out that [Plaintiff] was an 'owner' to potential investors to instill confidence in the company by said investors" (*id.* at ¶ 86).

While each of these alleged "representations" arguably concerns present facts; none is alleged with the specificity required by Rule 9(b).  In no instance does Plaintiff plead the time and place

44

that the alleged statement was made, and certain of these allegations even fail to specify the speaker and the specific content of his or her statements.

As Plaintiff's negligent representation claim is deficient under Rule 9(b), the Court need not, at this time, reach the question of whether this claim would be barred under the economic loss rule.  Nor *could* the Court reach that question at this point, as the place where the alleged misrepresentations were made (which has not been stated in Plaintiff's current pleading) would likely determine whether New York or Colorado law would apply to the claim, and that determination, in turn, would likely affect the outcome of the economic loss analysis.  (*See* n.18, *supra*.)

At this time, Plaintiff should be directed to amend his negligent misrepresentation claim, so as to provide the details required by Rule 9(b).  While this Court does recommend that certain of Plaintiff's other claims simply be dismissed (*see, e.g.,* Discussion *supra* regarding Plaintiff's claims against defendant Nagel), dismissing this claim without first affording Plaintiff the opportunity to cure his pleading defect would be inappropriate.  Unlike Defendants' other arguments, which Defendants raised in their earlier motion to dismiss Plaintiff's original pleading and which already led Plaintiff to amend his Complaint once, Defendants' argument regarding Rule 9(b) was not raised until their reply submission on the instant motion.  Thus, Plaintiff has not yet had a chance to respond to the argument by amending his pleading.  Further, as Plaintiff, until very recently, was proceeding *pro se*, and as this pleading defect may well be curable, he should be permitted to amend this claim at least once, before the claim is dismissed. *See Gomez*, 171 F.3d at 795-96.

### c.    Quantum Meruit and Unjust Enrichment

Defendants move to dismiss Plaintiff's quantum meruit and unjust enrichment claims on two alternative grounds:  (1) that these claims are barred because Plaintiff has alleged the existence of an enforceable contract, and (2) that Plaintiff has failed to allege the "reasonable value" of the services he provided, which is, according to Defendants, an "essential element" of quantum meruit and unjust enrichment claims.  (Def. Mem. at 26.)  Neither of these arguments has merit.

Plaintiff's contract claim does not prohibit him from pursuing, in the alternative, claims for quantum meruit and unjust enrichment.  On this point, Defendants rely on the general principle that "[t]he existence of an enforceable written contract covering the matter at issue precludes recovery for causes of action sounding in quasi contract."  *La Cruz v. Caddell Dry Dock & Repair Co., Inc.*, 804 N.Y.S.2d 58, 60 (1st Dep't 2005) (cited in Def. Mem. at 26); *Bedard v. Martin*, 100 P.3d 584, 592 (Colo. Ct. App. 2004) (stating same principle under Colorado law) (cited in Def. Mem. at 26).  Here, however, the parties dispute whether there is an enforceable written contract at all.  In such a situation, Rule 8(d)(2) of the Federal Rule of Civil Procedure permits a plaintiff to plead claims for breach of contract and, in the alternative, claims for quantum meruit and unjust enrichment.  *See Clyne v. Walters*, No. 08-cv-01646-MSK-CBS, 2009 U.S. Dist. LEXIS 84578, at *7-8 (D. Colo. Sept. 16, 2009); *see also Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 531 (S.D.N.Y. 2007) ("[w]hen there is a bona fide dispute as to the existence of a contract . . .[,] assertion of a breach of contract claim does not preclude [plaintiff] from pleading an unjust enrichment claim in the alternative").

Alternatively, Defendants argue that Plaintiff's quantum meruit and unjust enrichment claims should be dismissed because Plaintiff has failed to allege a "reasonable value" for the

46

services provided.  (*See* Def. Mem. at 26.)  Although Plaintiff has alleged that he worked more

than 5800 hours and his work is worth $200 per hour, Defendants maintain that this valuation is

"patently unreasonable."  (Def. Mem. at 26.)  Defendants offer no legal authority for dismissing

Plaintiff's claims on such grounds, however, and Defendants' mere disagreement with Plaintiff's

allegations about the value of his services is not a sufficient basis for Rule 12(b)(6) dismissal.

Defendants' motion to dismiss the quantum meruit and unjust enrichment claims should

therefore be denied.

### d. <u>Promissory Estoppel</u>

Defendants contend that Plaintiff's promissory estoppel claims should be dismissed

because Defendants' three alleged "promises" were too vague to be actionable or were not

actually "promises."  (Def. Mem. at 26-28.)  Alternatively, Defendants argue that the Plaintiff

could not have reasonably relied on promises that were unwritten and "did not specify the

amount of his compensation."  (Def. Mem. at 28.)

The first alleged promise was an equity interest for Plaintiff in the LLC.  Defendants

argue that this promise was too vague to be enforceable because the percentage ownership was

"never settled upon."  (Def. Mem. at 27.)  As already discussed, however, Plaintiff alleges that

Reed sent him a written agreement stating that Plaintiff would receive a two percent equity

interest in the LLC.  To state a claim for promissory estoppel under Colorado law, the alleged

promise need only be "'sufficiently specific so that the judiciary can understand the obligation

assumed and enforce the promise according to its terms.'"  *Jones v. Denver Pub. Sch.*, 427 F.3d

1315, 1325 (quoting *Soderlun v. Pub. Serv. Co. of Colo.*, 944 P.2d 616, 620 (Colo. Ct. App.

1997)).  Here, the alleged two percent interest was sufficiently specific.  Defendants' motion to

dismiss the promissory estoppel claim should therefore be denied with respect to the alleged promise of an equity interest in the LLC.

The second alleged promise was a joint venture interest in the ACOEM UMK. Defendants argue that, even taking Plaintiff's allegations as true, it is apparent that no named defendant ever made any actionable "promise" regarding the alleged joint venture. According to Defendants, if anyone suggested that Plaintiff be given an ownership interest in the joint venture, it was Plaintiff himself, not Defendants. Indeed, Plaintiff does allege that he, himself, suggested a joint venture plan that included a 15 percent ownership stake, and that Reed merely stated that this plan "seemed fair" and "urged [Plaintiff] to continue." (Am. Compl. at ¶ 12(j)(k).) Under Colorado law, a promise is actionable only if it "either discloses promissory intent or constitutes 'a commitment.'" *Jones v. Denver Pub. Sch.*, 427 F.3d at 1325. Reed's purported comments, as alleged by Plaintiff, neither demonstrated a promissory intent nor constituted a commitment. His non-committal response, as alleged, conveyed only a belief that Plaintiff's proposed plan "*seemed* fair" and a desire for Plaintiff to continue working on the project. This does not represent a promise. Defendants are therefore correct that Plaintiff has failed to state a claim for promissory estoppel with respect to the alleged joint venture. In addition, the Court notes that Defendants raised this argument in their earlier motion to dismiss (*see* Def. Init. Mem. at 22-24), and that Plaintiff has already amended his Complaint in response. Accordingly, I recommend that this claim also be dismissed.

The third alleged promise was that Plaintiff would be given additional compensation if he helped arrange the sale of the LTD. According to the Amended Complaint, this alleged promise arose from Reed's statement that "the 'more he ([Dr.] REED) could get (as an offer) the more he ([Plaintiff]) would receive." (Am. Compl. at ¶ 132.) This alleged promise is too vague to be

enforceable, for it is impossible for the Court to "understand the obligation assumed and enforce the promise according to its terms." *Jones v. Denver Pub. Sch.*, 427 F.3d at 1325 (internal quotation marks and citations omitted).  Further, as Defendants argued in their first motion to dismiss that this alleged promise was too vague to be actionable, and as Plaintiff's amendment did not cure the deficiency, I recommend that this claim be dismissed, as well.

In sum, Defendants' motion to dismiss Plaintiff's promissory estoppel claim should be denied insofar as that claim arises from the alleged promise of an equity interest in the LLC, and granted in all other respects.

### e.      Breach of Fiduciary Duty

Defendants argue that no fiduciary duty was owed to Plaintiff as a matter of law, and that his breach of fiduciary claim must therefore be dismissed.  (Def. Mem. at 28-29.)  Plaintiff contends that he was owed a fiduciary duty (1) as Director of the LTD and LLC, (2) based on a special relationship of trust between Plaintiff and Defendants, (3) as a joint venturer with Defendants, and (4) as an the owner of equity in the LLC.  (Am. Compl. at 53; Def. Mem. at 28-29.)  Defendant's motion to dismiss this claim should be granted to the extent that the claim is based upon Plaintiff's status as a Director of the LTD and LLC or upon a special relationship of trust between Plaintiff and Defendants.  Defendants' motion should be denied insofar as the claim is based upon the alleged joint venture and upon Plaintiff's alleged status as an owner of an equity interest in the LLC.

Plaintiff was owed no fiduciary duty as a member of the LTD's or LLC's boards of directors.  Under Colorado law, a corporate director owes a fiduciary duty to the corporation and its shareholders.  *Security Nat'l Bank v. Peters, Writer & Christensen, Inc.*, 39 Colo. App. 344, 350 (Ct. App. Colo. 1977).  This duty runs one way; the director is not owed a duty by the

corporation or shareholders.  *See MDM Group Assocs. v. CX Reinsurance Co. Ltd.*, 165 P.3d

882, 888 (Ct. App. Colo. 2007).  Thus, Plaintiff's breach of fiduciary duty claim should be

dismissed, to the extent that it is based upon Plaintiff's status as a director of the LTD and LLC.

Plaintiff has also failed to allege sufficient facts to establish that he was owed a fiduciary

duty based on a "special relationship of trust."  (*See* Am. Compl. at 49, ¶ 2.)  Beyond Plaintiff's

conclusory allegation of a "special relationship," Plaintiff alleges only that the Defendants

trusted him with their confidential data.  (*See id.*)  Although this allegation might suggest that

Plaintiff owed a fiduciary duty to Defendants (as their so-called "confidant" (*see id.* at 49,

¶ 2(c))), it is insufficient to establish a reciprocal duty running from Defendants to Plaintiff.  *See*

*MDM Group Assocs.*, 165 P.3d at 888.  Defendants made this argument in their initial motion

(*see* Def. Init. Mem. at 24-25), and Plaintiff's amendment to his Complaint did not render his

claim any more viable.  I therefore recommend that his breach of fiduciary duty claim be

dismissed, to the extent it is based on a supposed "special relationship of trust."

As to Plaintiff's claim, however, that he was owed a fiduciary duty pursuant to his

alleged "joint venture" with certain Defendants, Defendants have offered no meaningful

challenge.  (*See* Def. Mem. at 28-29.)  Certainly, Defendants do not argue that Plaintiff's

allegations, if taken as true, would be legally insufficient to establish a joint venture – in fact,

Defendants do not cite a single case concerning the legal requirements for a joint venture.[20]  Nor

do Defendants challenge Plaintiff's correct legal assertion that joint venture partners owe one

---

[20] The elements of a joint venture under Colorado law are (1) "joint interest in the property by the parties sought to be held as partners," (2) "agreements, express or implied, to share in the profits and losses of the venture," and (3) "actions and conduct showing co-operation in the project."  *Sleeping Indian Ranch, Inc. v. W. Ridge Group*, 119 P.3d 1062, 1069 (Colo. 2005).

another fiduciary duties.[21]  As to this aspect of Plaintiff's breach of fiduciary duty claim,

Defendants merely dispute Plaintiff's factual allegations, note certain inconsistencies in the

dollar amounts purportedly invested by Plaintiff in the alleged joint venture project, and contend

that Plaintiff never alleged that Reed "agreed upon" the 15 percent ownership figure suggested

by Plaintiff.  (*See* Def. Mem. at 9-10; Am. Compl. at ¶ 99.)  Yet the Amended Complaint

contains specific allegations that Plaintiff presented a plan to Reed whereby Plaintiff would fund

the development of the ACOEM UMK product, the product would then be marketed by the

LTD, and Plaintiff would receive 15 percent of the value of the product as a joint venture owner.

(Am. Compl. at ¶ 12(j)(k).)  Reed then allegedly urged Plaintiff to proceed on this basis.  (*See*

*id.*)  In the absence of any argument from Defendants as to why Plaintiff's allegations would be

insufficient to establish a joint venture under Colorado law, Defendants' motion to dismiss based

on lack of fiduciary duty should be denied with respect to the alleged joint venture.

      Finally, Plaintiff has adequately alleged that he was owed a fiduciary duty by Reed and

Grace because he was an equity owner in the LLC.  Although Defendants dispute whether

Plaintiff had an equity interest in the LLC, that issue cannot be resolved on this motion to

dismiss.  (*See* Discussion *supra,* at Point II(D)(2).)  As noted above, corporate directors owe a

fiduciary duty to the corporation's shareholders under Colorado law.  *See Security Nat'l Bank*,

39 Colo. App. at 350.  Accordingly, as Reed and Grace were directors of the LLC, they owed

Plaintiff a fiduciary duty if he in fact owned an equity interest in the LLC.  For this reason,

---

[21] In fact, once a joint venture is found, Colorado law dictates that "[j]oint venturers owe to each other a fiduciary duty of loyalty and fair, open, and honest disclosure."  *McCrea & Co. Auctioneers, Inc. v. Dwyer Auto Body*, 799 P.2d 394, 397-98 (Colo. Ct. App. 1989) (citing *Hooper v. Yoder*, 737 P.2d 852 (Colo. 1987)).

Defendants' motion to dismiss based on lack of fiduciary duty should also be denied with respect to Plaintiff's alleged equity interest.

### 3.        Claims Against Reed, Grace, and the LLC

As discussed *supra* at Point II(A)(3)(c), Plaintiff has alleged adequate facts to support piercing the corporate veil in order to assert personal jurisdiction over Reed and Grace.  Beyond contesting the accuracy of Plaintiff's allegation that Reed and Grace personally own the MDA, Defendants have failed to offer any legitimate reason why the Court should not also accept Plaintiff's veil-piercing allegations for purposes of Defendant's Rule 12(b)(6) motion.  Thus, to the extent Plaintiff adequately states claims against the LTD, his claims against Reed and Grace should also be permitted to stand at this juncture.

As for Plaintiff's claims against the LLC, Plaintiff, as already noted, has adequately alleged that the LLC was the LTD's successor in interest for at least a portion of the relevant time period.  *See CMCB Enters. v. Ferguson*, 114 P.3d 90, 93 (Ct. App. Colo. 2005) ("when there is a continuation of directors, management, and shareholder interest," the successor entity will be liable for the obligations of its predecessor).  Defendants fail to explain why, if taken as true, the LLC's alleged status as the LTD's successor would not support Plaintiff's claims against the LLC; instead, Defendants merely dispute the facts concerning the LLC's operations and status.  (*See generally* Def. Mem. at 21-29.)  As Plaintiff has introduced plausible allegations that the LLC, not the LTD, operated as "Reed Group" throughout 2005, Defendants' efforts to dispute these facts are insufficient to support Rule 12(b)(6) dismissal.

In sum, insofar as Plaintiff has stated claims against the LTD for breach of contract, quantum meruit, promissory estoppel, breach of fiduciary duty, and unjust enrichment, he has

also stated such claims as against Reed, Grace, and the LLC, and such claims against these

defendants should not be dismissed.

## **CONCLUSION**

For all of the foregoing reasons, I hereby recommend that Defendants' motion to dismiss

the Amended Complaint or in the alternative transfer the case (Dkt. 28) be resolved as follows:

> (1)     Plaintiff's claims against defendant Nagel should be
> dismissed under Fed. R. Civ. P. 12(b)(2) for lack of
> personal jurisdiction;

> (2)     Plaintiff should be afforded 30 days to amend his negligent
> misrepresentation claim so as to satisfy the particularity
> requirements of Fed. R. Civ. P. 9(b);

> (3)     Plaintiff's promissory estoppel claim should be dismissed
> to the extent such claim is based on alleged promises by
> Defendants concerning either (a) Plaintiff's joint venture
> interest and/or (b) additional compensation for Plaintiff's
> efforts to sell the LTD;

> (4)     Plaintiff's breach of fiduciary duty claim should be
> dismissed to the extent such claim is based on
> (a) Plaintiff's status as a Director and/or (b) a purported
> special relationship of trust between Plaintiff and
> Defendants; and

> (5)     Defendants' motion should be denied in all other respects.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections.  *See also* Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be

filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable

Deborah A. Batts, United States Courthouse, 500 Pearl Street, Room 2510, New York, New

York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street,

Room 525, New York, New York 10007.  Any requests for an extension of time for filing

objections must be directed to Judge Batts.   FAILURE TO FILE OBJECTIONS WITHIN

FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL

PRECLUDE APPELLATE REVIEW.   *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-*

*CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d

298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v.*

*Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
         January 24, 2011

                                        Respectfully submitted,


                                        DEBRA FREEMAN
                                        United States Magistrate Judge


Copies to:

The Honorable Deborah A. Batts, U.S.D.J.

Kenneth Barrett Phillips, Esq.
12 Walnut Street
Natick, MA 01760

Leslie David Corwin, Esq.
Greenberg Traurig, LLC
200 Park Avenue
New York, NY 10166