**Exhibit A:     LLC Operating Agreement ("Agreement')**

| | |
|---|---|
| **Kenneth F. Phillips,** | |
| *Plaintiff,* | ) |
| | ) |
| | ) |
| **vs.** | ) **Case No.: No. 07-CV-3417(RO)DCF**) |
| | ) |
| **Presley Reed,** | ) |
| **Stacey Grace** | ) |
| **Reed Group, Ltd** | )     **JURY TRIAL DEMANDED** |
| **Reed Group, LLC** | ) |
| | )     **ECF CASE** |
| *Defendants* | ) |
| | ) |
| | ) |

**Plaintiff's Second Amended Verified Complaint and Jury Demand**



March 25, 2005
Version: 1

# OPERATING AGREEMENT

## OF

## REED GROUP, LLC

### (A Colorado Limited Liability Company)

**By and Between**

**Reed Group, LLC**

**(the Company),**

**Presley Reed, Stacey Grace Reed, and the Presley Reed 1999 Family Trust**

**(its members)**

**and**

**those persons indicated on the attached Schedule A**

**as its Economic Interest Owners**

**Dated as of _____, 2005**

## *CONTENTS*

**ARTICLE I — DEFINITIONS** ........................................................................ 1

    1.01.    *Act* ............................................................................................. 1

    1.02.    *Articles of Organization* ............................................................. 1

    1.03.    *Capital Account* ......................................................................... 1

    1.04.    *Capital Contribution* ................................................................. 2

    1.05.    *Capital Interest* ......................................................................... 2

    1.06.    *Code* .......................................................................................... 2

    1.07.    *Company* .................................................................................... 2

    1.08.    *Deficit Capital Account* ............................................................. 2

    1.09.    *Distributable Cash* .................................................................... 2

    1.10.    *Economic Interest* ..................................................................... 2

    1.11.    *Economic Interest Owner* .......................................................... 2

    1.12.    *Encumber* .................................................................................. 2

    1.13.    *Entity* ........................................................................................ 3

    1.14.    *Fiscal Year* ............................................................................... 3

    1.15.    *Lineal Descendant* .................................................................... 3

    1.16.    *Majority Interest* ....................................................................... 3

    1.16.    *Manager* .................................................................................... 3

    1.17.    *Member* ..................................................................................... 3

    1.18.    *Membership Interest* .................................................................. 3

    1.19.    *Net Profit* and *Net Losses* ......................................................... 3

    1.20.    *Operating Agreement* ................................................................ 3

    1.21.    *Person* ....................................................................................... 3

    1.22.    *Profits Interest* .......................................................................... 4

    1.23.    *Related Party* ............................................................................ 4

    1.24.    *Reserves* .................................................................................... 4

    1.25.    *Selling Member* ......................................................................... 4

    1.26.    *Transfer* .................................................................................... 4

    1.27.    *Transferring Member* ................................................................ 4

**ARTICLE II — FORMATION OF COMPANY** ...................................... 4

    2.01.    *Name* ......................................................................................... 4

    2.02.    *Principal Place of Business* ....................................................... 4

**ARTICLE III — BUSINESS OF COMPANY** ......................................................... 5

**ARTICLE IV — NAMES AND ADDRESSES OF MEMBERS** ........................... 5

**ARTICLE V — GOVERNANCE AND MANAGEMENT** ................................... 5

**ARTICLE VI — RIGHTS AND OBLIGATIONS OF MEMBERS** .................... 10

    6.01.    *Limitation of Liability* ..................................................... 10
    6.02.    *Liability for Company Debt* ............................................ 10
    6.03.    *List of Members* ............................................................. 10
    6.04.    *Priority and Return of Capital* ....................................... 10
    6.05.    *Liability of a Member to the Company* ........................... 10

**ARTICLE VII — MEETINGS OF MEMBERS** ............................................... 11

    7.01.    *Annual Meeting* ............................................................. 11
    7.02.    *Special Meetings* ........................................................... 11
    7.03.    *Place of Meetings* .......................................................... 11
    7.04.    *Record Date* ................................................................... 11
    7.05.    *Quorum* .......................................................................... 11
    7.06.    *Manner of Acting* .......................................................... 12
    7.07.    *Proxies* ........................................................................... 12
    7.08.    *Action by Members Without a Meeting* .......................... 12
    7.09.    *Waiver of Notice* ........................................................... 12

**ARTICLE VIII — CAPITAL CONTRIBUTIONS AND ACCOUNTS** .............. 13

    8.01.    *Initial Capital Contributions* ........................................ 13
    8.02.    *No Permitted or Required Additional Contributions* ............. 13
    8.04.    *Capital Accounts* ........................................................... 13
    8.04.    *Vesting of Jim's Capital Account* ................................... 15
    8.05.    *Withdrawal or Reduction of Capital Contributions* ............. 15

**ARTICLE IX — ALLOCATIONS AND INCOME TAX MATTERS** ................. 15

    9.01.    *Allocation of Profits and Losses* ................................... 15
    9.02.    *[Reserved]* ..................................................................... 15
    9.03.    *[Reserved]* ..................................................................... 15
    9.04.    *Distributions* ................................................................. 15
    9.05.    *Limitation Upon Distributions* ...................................... 16
    9.06.    *Accounting Principles* ................................................... 16
    9.07.    *Accounting Period* ......................................................... 16
    9.08.    *Interest On and Return of Capital Contributions* ............. 16

9.09.   *Loans to Company* .................................................................................16
9.10.   *Returns and Other Elections*..................................................................16

**ARTICLE  X — TRANSFERS  AND  PURCHASES  OF  MEMBERSHIP INTERESTS** ........................................................................................**17**

10.01.  *General Restrictions on Transfers* ........................................................17
10.02.  *Transfers of Membership Interests Without Consent*.............................17
10.03.  *Transfers of Membership Interests With Consent*..................................17
10.04.  *Mandatory Sale and Purchase*..............................................................18
10.05.  *[Reserved]* .............................................................................................20
10.06.  *Obligations of Transferees* ...................................................................20
10.07.  *Transferee Not Member in Absence of Unanimous Consent* ..................21

**ARTICLE XI — ADDITIONAL MEMBERS**..................................................**21**

**ARTICLE XII — DISSOLUTION AND TERMINATION**................................**22**

12.01.  *Dissolution* ............................................................................................22
12.02.  *Effect of Filing of Dissolving Statement* ...............................................22
12.03.  *Winding Up, Liquidation, and Distribution of Assets*............................22
12.04.  *Articles of Dissolution*...........................................................................24
12.05.  *Certificate of Dissolution* ......................................................................24
12.06.  *Return of Contributions Nonrecourse to Other Members*......................24

**ARTICLE XIII — MISCELLANEOUS PROVISIONS** ..................................**24**

13.01.  *Notices*...................................................................................................24
13.02.  *Records*..................................................................................................25
13.03.  *Application of Colorado Law* .................................................................26
13.04.  *Waiver of Action for Partition* ...............................................................26
13.05.  *Amendments*...........................................................................................26
13.06.  *Execution of Additional Instruments*.....................................................26
13.07.  *Construction* ..........................................................................................26
13.08.  *Headings* ...............................................................................................26
13.09.  *Waivers*..................................................................................................26
13.10.  *Rights and Remedies Cumulative* ..........................................................26
13.11.  *Severability* ...........................................................................................26
13.12.  *Heirs, Successors, and Assigns* .............................................................27
13.13.  *Creditors*...............................................................................................27
13.14.  *Counterparts* .........................................................................................27
13.14.  *Counterparts* .........................................................................................27

**SCHEDULE A — *INITIAL CAPITAL CONTRIBUTIONS, PROFITS INTERESTS, VESTED INTERESTS* ...................................................................29**

**OPERATING AGREEMENT**

**OF**

**REED GROUP, LLC**


This OPERATING AGREEMENT of Reed Group, LLC is entered into by and between Reed Group, LLC (the "Company"), Presley Reed ("Presley"), Stacey Grace Reed ("Stacey"), the Presley Reed 1999 Family Trust (the "Trust"), and those persons indicated on the attached Schedule A as being its Economic Interest Owners, to be effective as of _____, 2005 (the "Effective Date").

In consideration of the mutual promises set forth below, the parties therefore agree that the Operating Agreement of the Company shall be set forth as follows:


### ARTICLE I — DEFINITIONS

The following terms, when used throughout this Agreement, shall have the meanings specified, unless the context clearly requires otherwise:

1.01.   "*Act*" shall mean the Colorado Limited Liability Company Act, C.R.S. 7-80-101 *et seq*., as it presently exists, as it may be amended, or any successor statute of similar purpose

1.02.   "*Articles of Organization*" shall mean the Articles of Organization of the Company as filed with the Secretary of State of Colorado, and as the same may be amended from time to time.

1.03.   "*Capital Account*" shall mean an account which the Company maintains on its financial books and records and which consists of the aggregate Capital Contributions that a Member has made to the Company and that has been adjusted up to the date in question in accordance with the provisions of Article VIII.

1.04. "*Capital Contribution*" shall mean a contribution by a Member, whenever made and whether in cash or property, to the capital of the Company.

1.05. "*Capital Interest*" shall mean the proportion that a Member's positive Capital Account bears to the aggregate positive Capital Accounts of all Members whose Capital Accounts have positive balances, as they may be adjusted from time to time. For purposes of the preceding calculation, all of the Members' Capital Accounts shall be rounded to the nearest multiple of $10 (with Capital Accounts that are a multiple of $5.00 or greater being rounded upwards).

1.06. "*Code*" shall mean the Internal Revenue Code of 1986, as it presently exists, as it may be amended, or any successor statute of similar purpose.

1.07. "*Company*" shall mean Reed Group, LLC

1.08. "*Deficit Capital Account*" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year, after taking into account all Capital Account adjustments for that taxable year.

1.09. "*Distributable Cash*" shall mean all cash, revenues and funds received by the Company, less the sum of the following, to the extent paid or set aside by the Company: [a] all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; [b] all cash expenditures that the Company has incurred and that are incident to the normal operation of the Company's business; [c] such Reserves as the Members deem reasonably necessary to the proper operation of the Company's business.

1.10. "*Economic Interest*" shall mean a Member's or an Economic Interest Owner's share of and entitlement to the Company's Net Profits, Net Losses, and distributions of the Company's assets pursuant to this Operating Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision of the Members.

1.11. "*Economic Interest Owner*" shall mean those persons indicated as such on the attached Schedule A, who shall be the owners of an Economic Interest who are not Members.

1.12. "*Encumber*" shall mean to create, incur, assume, or suffer to exist any lien, security interest, pledge, claim, option, right of first refusal, or other encumbrance.

1.13.   "*Entity*" shall mean any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or any foreign trust or foreign business organization.

1.14.   "*Fiscal Year*" shall mean the Company's fiscal year, which shall be the calendar year.

1.15.   "*Lineal Descendant*" shall mean any natural child of any person and any child legally adopted by any person; any lineal descendant of any such natural or legally adopted child by blood or adoption shall be considered a child or the descendant of such person and the descendant of such person's ancestors.

1.16.   "*Majority Interest*" shall mean one or more Membership Interests which taken together exceed 50 percent of the aggregate of all Capital Interests of the Members (but not of any Economic Interests Owners).

1.17.   "*Managers*" shall mean Presley Reed and Stacey Grace Reed or such other person or entity selected by the Members pursuant to this Agreement to manage the Company.

1.18.   "*Member*" shall mean each of the parties who executes a counterpart of this Operating Agreement as a Member and each of the Persons who may subsequently become a Member. If a Person is a Member immediately prior to the purchase or other acquisition by such Person of an Economic Interest, such Person shall have all the rights of a Member with respect to such purchased or otherwise acquired Membership Interest or Economic Interest, as the case may be.

1.19.   "*Membership Interest*" shall mean a Member's entire interest in the Company, including such Member's Economic Interest and such other rights and privileges that a Member may enjoy by being a Member.

1.20.   "*Net Profits*" and "*Net Losses*" shall mean the income, expense, gain, and loss of the Company, in the aggregate or separately stated, as appropriate, determined at the close of each fiscal year under the method of accounting employed on the Company's information tax return filed for federal income tax purposes.

1.21.   "*Operating Agreement*" shall mean this Operating Agreement as it is originally executed and as it may be amended from time to time.

1.22.   "*Person*" shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

1.23.   "*Profits Interest"* shall mean the percentage interest of a Member or Economic Interest Owner in the Net Profits and Net Losses of the Company as determined from time to time under Sections 9.01 and 9.02.

1.24.   "*Related Party*" shall mean, with respect to any Person, [a] any Entity of which such Person is a shareholder, partner, member, or beneficiary, [b] any Entity of which such Person is a director, officer, trustee, or other fiduciary, and [c] any ancestor, spouse, or descendant of such Person.

1.25.   "*Reserves*" shall mean, with respect to any fiscal period, funds set aside or amounts allocated in such amounts as the Members deem sufficient for the purpose of providing for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

1.26.   "*Selling Member*" shall mean any Member or Economic Interest Owner which, for consideration, Transfers or Encumbers all or any portion of his or her Membership Interest or Economic Interest.

1.27.   "*Transfer*" shall mean any sale, exchange, assignment, gift, bequest, devise, or other method of disposition, whether voluntary, involuntary, or by operation of law.

1.28.   "*Transferring Member*" shall collectively mean a Selling Member and any Member or Economic Interest Owner who gifts, bequeaths, or otherwise transfers for no consideration (by operation of law or otherwise, except with respect to bankruptcy) all or any part of his or her Membership Interest or Economic Interest.


## ARTICLE II — FORMATION OF COMPANY

2.01.   *Name*. The name of the Company is Reed Group, LLC

2.02.   *Principal Place of Business*. The principal place of business of the Company within the State of Colorado shall be at 10155 Westmoor Drive, Suite 210, Westminster, Colorado 80021. The Company may locate its places of business and registered office at any other place or places as the Members may from time to time deems advisable.

2.03.   *Term*. The period of duration of the Company shall be perpetual, from the date of filing of Articles of Organization with the Secretary of State for the State of Colorado, unless the Company is earlier dissolved in accordance with the provisions of either the Act or this Operating Agreement.

## ARTICLE III — BUSINESS OF COMPANY

The business of the Company shall be:

[a]     To accomplish any other lawful business whatsoever, or which shall at any time appear conducive to or expedient for the protection or benefit of the Company and its assets;

[b]     To exercise all other powers necessary to or reasonably connected with the Company's business which may be legally exercised by limited liability companies under the Act;

[c]     To engage in all activities necessary, customary, convenient, or incident to any of the preceding businesses.

## ARTICLE IV — NAMES AND ADDRESSES OF MEMBERS

The names and addresses of the Members are as follows:

| Name | Address |
| --- | --- |
| Presley Reed | 10155 Westmoor Drive, Suite 210 Westminster, Colorado 80021 |
| Stacey Grace Reed | 10155 Westmoor Drive, Suite 210 Westminster, Colorado 80021 |
| Presley Reed 1999 Family Trust | 999 Eighteenth Street, Suite 3000 Denver, Colorado 80202 |

## ARTICLE V — GOVERNANCE AND MANAGEMENT

5.1 *Management*. The business and affairs of the Company shall be managed by its Managers. The Managers shall direct, manage and control the business of the Company to the best of their ability. Except for situations in which the approval of the members is expressly required by this Operating Agreement or by non-waivable provisions of applicable law, the Managers shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business. At anytime when there is more than one Manager, any one Manager may take any action permitted to be taken by the Manager, unless the approval or more than one of the Managers is expressly required pursuant to this Operating Agreement or the Act.

5.2 *Number, Tenure and Qualification*. The Company shall initially have two Managers. The number of Managers of the Company shall be fixed from time to time by a vote of the members holding a Majority Interest, but in no instance shall there be less than two Managers. The initial Managers serve as Managers until their resignation or removal pursuant to the terms of this Operating Agreement.

5.3 *Certain Powers of Managers*.

[a]   Without limiting the generality of Section 5.1, the Managers shall have the power and authority, on behalf of the Company:

[i]   To acquire property from any Person as the Managers may determine. The fact that a Manager or a Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Managers from dealing with that Person;

[ii]   To borrow money for the Company from banks, other lending institutions, the Managers, the Members, or Affiliates of the Managers or the Members, and in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums. No debt shall be contracted or liability incurred by or on behalf of the Company except by the Managers, or to the extent permitted under the Colorado Act, by agents or employees of the Company expressly authorized to contract such debt or incur such liability by the Managers;

[iii]   To purchase liability and other insurance to protect the Company's property and business;

[iv]   To hold and own any Company real and/or personal properties in the name of the Company;

[v]   To invest any Company funds temporarily [by way of example bit not limitation] in time deposits, short-term governmental obligations, commercial paper or other investments;

[vi]   Upon the affirmative vote of the Members holding at least two-thirds of the Profits Interests, to sell or otherwise dispose of all or substantially all of the assets of the Company as part of a single transaction or plan so long as such disposition is not in violation of or a cause of a default under any other agreement to which the Company may be bound, provided, however, that the affirmative vote of the Members shall not be required with respect to any sale or disposition of the Company's assets in the ordinary course of the Company's business;

[vii]   To execute on behalf of the Company all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments; bills of sale; leases; partnership agreements, operating agreements of other limited liability companies; and any other instruments or documents necessary, in the opinion of the Managers, to the business of the Company.

[viii]   To employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds;

[ix]   To enter into any and all other agreements on behalf of the Company, with any other Person for any purpose, in such forms as the Managers may approve; and

[x]   To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

Unless authorized to do so by this Operating Agreement or by the Managers, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose. No Member shall have any power or authority to bind the Company unless the Member has been authorized by the Managers to act as an agent of the Company in accordance with the previous sentence.

5.4 *Restrictions on Authority of the Managers*.

[a]   No Manager shall have the authority to, and each Manager covenants and agrees that it shall not, do any of the following acts without the consent of two-thirds the Members:

[i]   Cause or permit the Company to engage in any activity that is not consistent with the purposes of the Company as set forth in Section 3.1 hereof;

[ii]   Knowingly do any act in contravention of this Operating Agreement;

[iii]   Knowingly do any act which would make it impossible to carry on the ordinary business of the Company, except as otherwise provided in this Operating Agreement;

[iv]   Confess a judgment against the Company in an amount in excess of $25,000.00;

[v]   Possess property, or assign rights in specific property, for other than a Company purpose;

[vi]   Knowingly perform any act that would cause the Company to conduct business in a state which has neither enacted legislation which permits limited liability companies to organize in such state nor permits the Company to register to do business in such state as a foreign limited liability company;

[vii]   Cause the Company to voluntarily take any action that would cause a bankruptcy of the Company;

[viii]   Cause a significant change in the nature of the Company's business;

[ix]   Cause the Company to admit any additional Members other than pursuant to Article XI hereof;

[x]   Sell or otherwise dispose of all or substantially all of the Company's assets other than in the ordinary course of the Company's business, except for a liquidating sale in connection with the dissolution of the Company.

5.5 *Liability for Certain Acts*. Each Manager shall perform his duties as Manager in good faith, in a manner he reasonably believes to be in the best interest of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Manager who so performs the duties as Manager shall not have any liability by reason of being or having been a Manager of the Company. The Managers do not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the operations of the Company. The Managers shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct, breach of this Agreement or a wrongful taking by the Managers.

5.6 *Managers and Members Have No Exclusive Duty to Company*. No Manager or Member shall be required to manage the Company as a sole and exclusive function and any Manager and/or Member may have other business interest and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have the right, by virtue of this Operating Agreement, to share or participate in such other investments or activities of any Manager and/or Member or to the income or proceeds derived therefrom. Neither any Manager nor any Member shall incur any liability to the Company or to any of the Members as a result of engaging in any other business or venture.

5.7 *Bank Accounts*. The Managers may from time to time open bank accounts in the name of the Company, and the Managers shall be the sole signatory thereon, unless the Managers determine otherwise.

5.8 *Indemnity of the Managers, Employees and Other Agents*. The Company shall indemnify the Managers and make advances for the expenses to the maximum extent permitted under Section § 7-80-410 of the Colorado Act. The Company shall indemnify its employees and other agents who are not Managers to the fullest extent permitted by law, provided that such indemnification in any given situation is approved by a vote of the members holding a Majority Interest.

5.9 *Resignation*. Any Manager of the Company may resign at any time by giving written notice to the Members of the Company. The resignation of any Manager shall take effect upon receipt of the notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a Dissociation of a Member.

5.10 *Removal*. At a meeting called expressly for that purpose, all or any lesser number of Managers may be removed at any time, with or without cause, by a vote of the members holding a Majority Interest. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a Dissociation of a Member.

5.11 *Vacancies*. Any vacancy occurring for any reason in the number of Managers of the Company may be filled by the affirmative vote of a majority of the remaining Managers then in office, provided that if there are no remaining Managers, the vacancy shall be filled by a vote of the members holding a Majority Interest. Any Manager's position to be filled by the affirmative vote of a majority of the Managers then in office or by an election at an annual meeting or at a special meeting of Members called for that purpose or by the Members' unanimous written consent. A Manager elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office and shall hold office until the expiration of such term and until his successor shall be elected and shall qualify or until his earlier death, resignation or removal. A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until the next annual meeting of Members and until his successors shall be elected and shall qualify, or until his earlier death, resignation or removal.

5.12 *Compensation*. The compensation of the Managers shall be fixed from time to time by a vote of the members holding a Majority Interest, and no Manager shall be prevented from receiving such compensation by reason of the fact that he is also a Member of the Company.

- 9 -

5.14 *Right to Rely on the Managers.*

[a]     Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by any Manager as to:

[i]     The identity of any Manager or any Member;

[ii]    The existence or nonexistence of any fact or facts which constitute a condition precedent to acts by any Manager or which are in any other manner germane to the affairs of the Company;

[iii]   The Persons who are authorized to execute and deliver any instrument or document of the Company; or

[iv]    Any act or failure to act by the Company or any other matter whatsoever involving the Company or any Member.

## ARTICLE VI — RIGHTS AND OBLIGATIONS OF MEMBERS

6.01.   *Limitation of Liability.* Each Member's liability shall be limited as set forth in the Act, this Operating Agreement, and other applicable law.

6.02.   *Liability for Company Debt.* No Member shall be personally liable for any debts or losses of the Company beyond such Member's respective Capital Contributions and any obligation of the Members under Article VIII to make Capital Contributions, except as provided in Section 6.05 or as otherwise required by law.

6.03.   *List of Members.* Upon written request of any Member to the Managers, the Managers shall provide a list showing the names, addresses, and Membership Interests and Economic Interests of all Members and Economic Interest Owners.

6.04.   *Priority and Return of Capital.* Except as may be expressly provided in Article IX, no Member or Economic Interest Owner shall have priority over any other Member or Economic Interest Owner, either as to the return of Capital Contributions or as to Net Profits, Net Losses, or distributions, provided that this Section shall not apply to loans (in contrast to Capital Contributions) which a Member has made to the Company.

6.05.   *Liability of a Member to the Company.* A Member or Economic Interest Owner who receives a distribution made by the Company which is either —

[a]      in violation of this Operating Agreement, or

[b]      when the Company's liabilities exceed its assets (after giving effect to the distribution),

is liable to the Company for a period of six years after such distribution for the amount of the distribution.

## ARTICLE VII — MEETINGS OF MEMBERS

7.01.   *Annual Meeting*. There shall be held an annual meeting of the Members at such date and time each year and at such place as the Managers may determine. Written notice stating the place, day, and hour of the meeting shall be given personally or mailed to each Member at least thirty days prior to the date fixed for the annual meeting. The annual meeting of the Members shall be for the purpose of electing officers and for the transaction of such other business as may come before the meeting.

7.02.   *Special Meetings*. Special meetings of the Members may be called at any time by the Managers or by the Members holding one–third of the Membership Interests. Special meetings shall be held at such time and place as may be designated by the authority calling such meeting. Notice stating the place, day, and hour of every special meeting shall be given to each Member either by mailing such notice at least twenty days before, or by an oral or written communication personally delivered at least fifteen days before, the date fixed for the meeting. The notice of such special meeting shall specify the business to be transacted at and the purpose of any special meeting of the Members.

7.03.   *Place of Meetings*. The Members may designate any place, either within or outside the State of Colorado, as the place of meeting for any meeting of the Members. If no designation is made, or if a special meeting is called, the place of meeting shall be at the principal office of the Company.

7.04.   *Record Date*. For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment of any such meeting, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of the Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment of such meeting.

7.05.   *Quorum*. Members holding at least a majority of all Capital Interests, represented in person or by proxy, shall constitute a quorum at any meeting of

Members. Less than a quorum may adjourn from time to time without further notice until a quorum is secured. However, if the adjournment is for more than 60 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Capital Interests whose absence would cause less than a quorum.

       7.06.   *Manner of Acting*. If a quorum is present, the affirmative vote of Members holding at least a majority of all the Capital Interests represented in person or by proxy at such meeting shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Act, by the Articles of Organization, or by this Operating Agreement. Unless otherwise expressly provided in this Agreement or required under applicable law, Members who have an interest (economic or otherwise) in the outcome of any particular matter upon which the Members vote or consent may vote or consent upon any such matter and their vote, or consent, as the case may be, shall be counted in the determination of whether the requisite matter was approved by the Members.

       7.07.   *Proxies*. At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Members or by a duly authorized attorney-in-fact. Such proxy shall be filed with the Managers of the Company before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

       7.08.   *Action by Members Without a Meeting*. Any action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by each Member entitled to vote and delivered to the Secretary of the Company for inclusion in the minutes or for filing with the Company records. Any action taken under this Section is effective when all Members entitled to vote have signed the consent, unless the consent specifies a different effective date. The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent.

       7.09.   *Waiver of Notice*. When any notice is required to be given to any Member, a waiver in writing of such notice signed by the person entitled to such notice, whether before, at, or after the time stated in such notice, shall be equivalent to the giving of such notice.

## ARTICLE VIII — CAPITAL CONTRIBUTIONS AND ACCOUNTS

8.01.   *Initial Capital Contributions*. Upon execution of this Agreement, each Member shall contribute such amount of money or property as is set forth on the attached Schedule A.

8.02.   *No Permitted or Required Additional Contributions*. Except to the extent that this Agreement may specifically provide to the contrary, no Member shall be permitted or required to make any additional Capital Contributions.

8.03.   *Capital Accounts*.

[a]   A separate Capital Account shall be maintained for each Member and Economic Interest Owner. Each Member's and Economic Interest Owner's Capital Account will be increased by —

[1]   the amount of money contributed by such Member or Economic Interest Owner to the Company;

[2]   the fair market value of property contributed by such Member or Economic Interest Owner to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code);

[3]   allocations to such Member or Economic Interest Owner of Net Profits; and

[4]   allocations to such Member or Economic Interest Owner of income of the Company that is exempt from federal income taxes.

Each Member's or Economic Interest Owner Capital Account will be decreased by —

[1]   the amount of money distributed by the Company to such Economic Interest Owner ;

[2]   the fair market value of property distributed by the Company to such Member or Economic Interest Owner (net of liabilities secured by such distributed property that such Member or Economic Interest Owner is considered to assume or take subject to under Section 752 of the Code);

[3]   allocations to such Member or Economic Interest Owner of expenditures that are not deductible in computing the Company's taxable income and that are not properly capitalizable as a Company asset; and

[4]     allocations to such Member or Economic Interest Owner of Net Losses.

[b]     In the event of a permitted sale or exchange of a Membership Interest or an Economic Interest in the Company, the Capital Account of the transferor, to the extent it relates to the transferred Membership Interest or Economic Interest, shall become the Capital Account of the transferee, in accordance with Treasury Regulation § 1.704-1(b)(2)(iv).

[c]     The manner in which Capital Accounts are to be maintained pursuant to this Section 8.03 is intended to comply with the requirements of Section 704(b) of the Code and its accompanying Treasury Regulations. If, in the opinion of the Company's accountants, the manner in which Capital Accounts are to be maintained pursuant to the provisions of this Section 8.03 should be modified in order to comply with Section 704(b) of the Code and its accompanying Treasury Regulations, then notwithstanding anything to the contrary contained in the provisions of this Section 8.03, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members or Economic Interest Owners.

[d]     Upon the liquidation of the Company (or any Member's Membership Interest or Economic Interest Owner's Economic Interest), liquidating distributions will be made in accordance with the positive Capital Account balances of the Members and Economic Interest Owners, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs. Liquidation proceeds will be paid within sixty days of the end of the taxable year (or, if later, within 120 days after the date of the liquidation). The Company may offset damages for breach of this Operating Agreement by a Member or Economic Interest Owner whose interest is liquidated (either upon the withdrawal of the Member or the liquidation of the Company) against the amount otherwise distributable to such Member.

[e]     Except as otherwise required in the Act (and subject to Section 8.01 and 8.02), no Member or Economic Interest Owner shall have any liability to restore all or any portion of a deficit balance in such Member's or Economic Interest Owner's Capital Account.

8.04.   *Vesting of Economic Interest Owners' Capital Accounts*. As of the Effective Date, each Economic Interest Owner shall be deemed to have Vested in his or her Capital Account to the extent set forth on the attached Schedule A. The Capital Account of each Economic Interest Owner shall further Vest at the rate of 25 percent for each full calendar year in which such Economic Interest Owner continues to be an Economic Interest Owner under this Operating Agreement.

8.05.   *Withdrawal or Reduction of Capital Contributions*.

[a]     No Member or Economic Interest Owner shall be entitled to withdraw all or any part of such Member's or Economic Interest Owner's Capital Contributions, except upon dissolution of the Company to the extent provided in Article XII or except upon the unanimous agreement of all of the other Members. In either event, a Member or Economic Interest Owner shall not receive out of the Company's property any part of his or her Capital Contributions until all liabilities of the Company, except liabilities to Members or Economic Interest Owner on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them.

[b]     A Member or Economic Interest Owner, irrespective of the nature of his or her Capital Contributions, has only the right to demand and receive cash in return for his or her Capital Contributions.


## ARTICLE IX — ALLOCATIONS AND INCOME TAX MATTERS

9.01.   *Allocation of Profits and Losses*. The Net Profits and Net Losses of the Company for each fiscal year shall be allocated to the Members and the Economic Interest Owners in in the percentages set forth on the attached Schedule A.

9.02.   *[Reserved]*

9.03.   *[Reserved]*

9.04.   *Distributions*.   Except as provided in Section 8.03[c], all distributions of cash or other property shall be made to the Members or Economic Interest Owners, as the case may be, pro rata in proportion to the respective Profits Interests of the Members or Economic Interest Owners on the record date of such distribution. All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Members or Economic Interest Owners from the Company shall be treated as amounts distributed to the relevant Member or Economic Interest Owners pursuant to this Section. To the greatest extent possible, consistent with sound business practices, the Company shall distribute to each Member and Economic

Interest Owner each year no less than an amount that the Managers reasonably believe to be adequate to allow each such Member and Economic Interest Owner defray the federal and state income tax liability associated with such Member's or Economic Interest Owner's Profits Interest for such year, calculated by applying the highest marginal income tax rates.

       9.05.   *Limitation Upon Distributions*. No distribution shall be declared and paid unless, after the distribution is made, the assets of the Company are in excess of all liabilities of the Company, except liabilities to Members on account of their contributions.

       9.06.   *Accounting Principles*. The profits and losses of the Company shall be determined in accordance with generally accepted accounting principles applied on a consistent basis using the cash basis method of accounting. It is intended that the Company will elect those accounting methods which provide the Company with the greatest tax benefits.

       9.07.   *Accounting Period*. The Company's accounting period shall be the calendar year.

       9.08.   *Interest On and Return of Capital Contributions*. No Member shall be entitled to interest on his or her Capital Contributions or to return of his or her Capital Contributions, except as otherwise specifically provided for in this Agreement.

       9.09.   *Loans to Company*. Nothing in this Operating Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company.

       9.10.   *Returns and Other Elections*. The Managers shall cause the preparation and timely filing of all tax and information returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Copies of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of the Company's fiscal year. For Colorado tax purposes, each Member and Economic Interest Owner which is a nonresident of Colorado shall execute and deliver to the Managers a Form DR 0107 ("Nonresident Tax Agreement") no later than 60 days after becoming a Member or Economic Interest Owner, as the case may be. The Managers shall timely file with the Colorado Department of Revenue, together with the Company's annual Colorado return, a Nonresident Tax Agreement with respect to each Nonresident Member and Economic Interest Owner. All elections permitted to be made by the Company under federal or state laws shall be made by the Managers in their sole discretion, provided that the Managers shall make any tax election requested by the Members owning a Majority Interest.

## ARTICLE X — TRANSFERS AND
## PURCHASES OF MEMBERSHIP INTERESTS

10.01.  *General Restrictions on Transfers*. Except as otherwise specifically provided in this Agreement, no Member shall Transfer or Encumber all or any part of his or her Membership Interest without the prior written consent of all of the other Members.

10.02.  *Transfers of Membership Interests Without Consent*. Notwithstanding the provisions of Section 10.01, a Member may Transfer, but only by gift, bequest, or devise, all or any part of such Member's Membership Interest, without the consent of any other Member, to —

        [a]     the spouse of a Member,

        [b]     a direct lineal descendant of a Member,

        [c]     a trust all of the present, future, and contingent beneficiaries of which are, at all times, limited to one or more Members, or the spouse or spouses or the direct lineal descendant or descendants of one or more Members, or

        [d]     a corporation all of the issued and outstanding capital stock of which is owned by one or more Members, or spouse or spouses or the direct lineal descendant or descendants of one or more Members, or a trust all of the present, future, and contingent beneficiaries of which are limited to the preceding.

all of which, together with all of the beneficiaries of a trust described in [c], shall be known as "Permitted Transferees." No further transfer by a Permitted Transferee shall be a transfer permitted under this Section. Any Permitted Transferee under this Section, for so long as such Permitted Transferee is under the age of 18 years, shall be deemed to hold only an Economic Interest, and not a Membership Interest until such Permitted Transferee's eighteenth birthday, at which time such Permitted Transferee shall be deemed to hold the actual interest transferred to such Permitted Transferee.

10.03.  *Transfers of Membership Interests With Consent*. A Member who desires to Transfer or Encumber all or any portion of his or her Membership Interest to or in favor of any transferee (other than in connection with a transfer permitted by Section 10.02) shall deliver to all the nontransferring Members a written notice stating all the terms and conditions upon which the transfer is proposed to be made and the consideration, if any, to be received for such transfer. If all of the nontransferring Members consent to such transfer, then the transferring Member shall be entitled to transfer such transferring Member's Membership Interest only upon the terms and conditions set forth in such written notice, and the nontransferring Members shall have no

right of first refusal with respect to the transferred interest and no right to transfer such nontransferring Members' Membership Interests to the proposed transferee or to any other transferee on any similar terms or any other terms, without the consent of the other Members in accordance with this Section. Whether or not such consent is given, the rights of any transferee or security holder shall be subordinate and subject to the rights and obligations which this Agreement creates.

   10.04. *Mandatory Sale and Purchase of an Economic Interest Owner's Economic Interest.*

   [a] For purposes of this Section 10.04, a "Mandatory Sale Event" shall mean any the following events with respect to an Economic Interest Owner, effective as of the effective date (the "Mandatory Sale Date") indicated:

   [1] The Economic Interest Owner's death.

   [2] The Economic Interest Owner's permanent disability, which shall be deemed to have occurred when a physician licensed to practice medicine shall deliver to the Managers a certification in writing that there exists a condition resulting from age, physical injury or illness, mental impairment, or other sickness or illness which renders the Economic Interest Owner substantially incapable of performing the normal duties and services previously performed by the Economic Interest Owner in his or her regular occupation with the Company and such condition has existed for at least six consecutive calendar months.

   [3] The termination by the Company of the Economic Interest Owner's employment with the Company for reasons other than the Economic Interest Owner's breach of the terms of his or her employment agreement, if any, effective as of the date of such termination.

   [4] The Economic Interest Owner's voluntary retirement or resignation from employment with the Company or the termination by the Company of the Economic Interest Owner's employment with the Company by virtue of the Economic Interest Owner's breach of the terms of his or her employment agreement, if any, effective as of the date of such retirement, resignation, or termination

   [5] The Economic Interest Owner's bankruptcy, effective as of the date of filing of a petition or other initial pleading, whether voluntary or involuntary, by or against the Economic Interest Owner under the federal bankruptcy laws.

[6]   The entry of a decree by a trial court of competent jurisdiction ordering the transfer of the Economic Interest Owner's Membership Interest to a person who is not a party to this Agreement, effective upon the date of entry of such decree.

For purposes of this Section 10.04, an event described above in [4], [5], and [6] shall not constitute a Mandatory Sale Event unless, within ten days after the effective date of such event, the Company has delivered written notice to the Economic Interest Owner of its intention to treat such event as a Mandatory Sale Event under this Section. Also for purposes of this Section 10.04, the term "Selling Group" shall collectively mean the Economic Interest Owner, the holders of all Economic Interests which the Economic Interest Owner permissibly transferred under Sections 10.02 and 10.03 at any time prior to the Mandatory Sale Date, and their legal representatives, successors, and assigns, as the case may be.

[b]   Effective as of the Mandatory Sale Date, and whether or not the applicable event constitutes a Mandatory Sale Event —

[i]   each member of the Selling Group who was a Member immediately prior to the Mandatory Sale Date shall cease to be a Member for all purposes under this Agreement other than Section 6.05 (relating to a Member's liability upon a return of that Member's contributions),

[ii]   each member of the Selling Group shall be considered to hold only an Economic Interest determined under this Section 10.04 at all times after the Mandatory Sale Date until the complete liquidation of the interests of all the members of the Selling Group,

[iii]   the Selling Group shall forfeit that portion of its Capital Accounts that is not "Vested" within the meaning of Section 8.04, and such portion shall be reallocated and deemed to belong to the Members in proportion to their Capital Interests.

[c]   Upon the occurrence of a Mandatory Sale Event, the Company shall be obligated to liquidate the interests of the members of the Selling Group in the Company and in the property of the Company, and, in exchange therefor, shall be obligated to pay to the Selling Group an amount (the "Redemption Price") equal to the amount that the Selling Group would have received. with respect to that portion of the Selling Group's Capital Account that has Vested within the meaning of Section 8.04, as a distribution pursuant to Article XII, upon the liquidation of the Company after sale by the Company of all of its assets for an amount equal to their net book value, the discharge of all of its liabilities, and the allocation of the resulting gain or loss pursuant to Article IX.

Within 30 days after the occurrence of a Mandatory Sale Event, the Company shall pay to the Selling Group, in cash, 10 percent of that portion of the Redemption Price described in above [i] and shall deliver to the Selling Group one or more nonnegotiable promissory notes providing for the payment of the balance of that portion of the Redemption Price described in above [i] in five equal installments on each anniversary of the end of the calendar quarter in which the Mandatory Sale Date occurred, which notes shall bear simple interest at a rate that is equal to one percent above the prime rate published in the *Wall Street Journal* on the Mandatory Sale Date, and which notes shall be subject to prepayment, in whole or in part, at any time without penalty.

10.05. *[Reserved]*.

10.06. *Obligations of Transferees*. As an express condition of the Company's and the other Members' recognition of any transfer or encumbrance or, if applicable, the substitution of a new Member as against the Company or otherwise, each transferring Member and each transferee permitted under Sections 10.02 and 10.03 shall execute, acknowledge, and deliver to the Company and to the remaining Members such instruments of transfer, assignment, and assumption and such other certificates, representations and documents, and perform all such other acts which the remaining Members may reasonably request from time to time in connection with such Transfer or Encumbrance or which the remaining Members may deem necessary or desirable to:

[a]     constitute such transferee as a Member, donee, or successor-in-interest, as applicable;

[b]     confirm that the person acquiring or desiring to acquire an interest or interests in the Company, or to be admitted as a Member, has accepted, assumed and agreed to be subject and bound by all of the terms, obligations and conditions of the Operating Agreement, as the same may have been further amended (whether such Person is to be admitted as a new Member or will merely be an Economic Interest Owner);

[c]     preserve the Company after the completion of such sale, transfer, assignment, or substitution under the laws of each jurisdiction in which the Company is qualified, organized or does business;

[d]     indemnify the Company and the remaining Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of the transfer,

[e]     preserve the Company after the completion of such Transfer or Encumbrance under the laws of each jurisdiction in which the Company is qualified, organized or does business;

[f]     maintain the status of the Company as a partnership for federal tax purposes; and

[g]     assure compliance with any applicable state and federal laws including securities laws and regulations.

Whether or not such purchaser, donee, or successor–in–interest has executed such instruments, certificates, representations, and documents, such purchaser, donee, or successor–in–interest shall nonetheless hold such Membership Interest or Economic Ownership Interest subject to the terms of this Agreement and shall automatically be deemed a party to this Agreement.

10.07. *Transferee Not Member in Absence of Unanimous Consent.*

[a]     Notwithstanding anything contained in this Agreement to the contrary, if all of the remaining Members do not approve by unanimous written consent of the proposed sale of the Transferring Member's Membership Interest or Economic Interest to a transferee or donee which is not a Member immediately prior to the sale or gift, then the proposed transferee or donee shall have no right to participate in the management of the business and affairs of the Company or to become a Member, and the transferee or donee shall be merely an Economic Interest Owner. No transfer of a Member's interest in the Company (including any transfer of the Economic Interest or any other transfer which has not been approved by unanimous written consent of the Members) shall be effective unless and until written notice (including the name and address of the proposed transferee or donee and the date of such transfer) has been provided to the Company and the nontransferring Members.

[b]     The restrictions on transfer contained in this Section 10.07 are intended to comply (and shall be interpreted consistently) with the restrictions on transfer set forth in C.R.S. Section 7-80-702(1).


## ARTICLE XI — ADDITIONAL MEMBERS

Any Person or Entity acceptable to all of the Members may become a Member in this Company either by the issuance by the Company of Membership Interests for such consideration as the Members by their unanimous votes shall determine, or by means of a transfer one or more Members' Membership Interest or any portion thereof, subject to the terms and conditions of this Operating Agreement. No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Company may, at the time a Member is admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of loss, income and expense deductions to a new Member for that portion of

the Company's tax year in which a Member was admitted in accordance with the provisions of Section 706(d) of the Code.

## ARTICLE XII — DISSOLUTION AND TERMINATION

12.01. *Dissolution*. The Company shall be dissolved if a Member or Members owning Capital Interests which in the aggregate constitute not less than two–thirds of the Capital Interests of all the Members vote to dissolve the Company at a meeting of the Members pursuant to Article VII.

12.02. *Effect of Filing of Dissolving Statement*. Upon the filing by the Colorado Secretary of State of a statement of intent to dissolve, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but its separate existence shall continue until a certificate of dissolution has been issued by the Secretary of State or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

12.03. *Winding Up, Liquidation, and Distribution of Assets*.

[a]      Upon dissolution, an accounting shall be made by the Company or its independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Members shall immediately proceed to wind up the affairs of the Company.

[b]      Upon dissolution, each Economic Interest Owner shall forfeit that portion of its Capital Accounts that is not "Vested" within the meaning of Section 8.04, and such portion shall be reallocated and deemed to belong to the Members in proportion to their Capital Interests.

[c]      If the Company is dissolved and its affairs are to be wound up, the Members shall:

[1]      Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Members may determine to distribute any assets to the Members in kind),

[2]      Allocate any profit or loss resulting from such sales to the Capital Account of each Member and, to the extent Vested within the meaning of Section 8.04, each Economic Interest Owners in accordance with Article IX,

[3]     Discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are creditors, to the extent otherwise permitted by law, other than liabilities to Members and Economic Interest Owners for distributions, and establish such Reserves as may be reasonably necessary to provide for contingent or liabilities of the Company (for purposes of determining the Capital Accounts of the Members and Economic Interest Owners, the amounts of such Reserves shall be deemed to be an expense of the Company),

[4]     Distribute the remaining assets in the following order:

[i]     If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Members. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted pursuant to the provisions of Article IX and Section 8.03 of this Operating Agreement to reflect such deemed sale.

[ii]    The positive balance (if any) of each Member's and Economic Interest Owner's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, as the Members may determine, with any assets distributed in kind being valued for this purpose at their fair market value as determined pursuant to Section 12.03[b][i]. Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Treasury Regulation § 1.704-1(b)(2)(ii)(b)(2).

[d]     Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations, and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contributions, and the negative balance of such

- 23 -

Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

[e]     Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

[f]     The Members shall comply with any applicable requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

12.04. *Articles of Dissolution*. When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members, articles of dissolution shall be executed in duplicate and verified by the person signing the articles, which articles shall set forth the information required by the Act. Duplicate originals of such articles of dissolution shall be delivered to the Colorado Secretary of State.

12.05. *Certificate of Dissolution*. Upon the issuance of the certificate of dissolution, the existence of the Company shall cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Act. The Members shall have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

12.06. *Return of Contributions Nonrecourse to Other Members*. Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of his or her Capital Contributions. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member.

## ARTICLE XIII — MISCELLANEOUS PROVISIONS

13.01. *Notices*. Any notice, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the party or to an executive officer of the party to whom the same is directed or, if sent by registered or certified mail, postage and charges prepaid, addressed to the Member's and/or Company's address, as appropriate, which is set forth in this Operating Agreement. Except as otherwise provided in this Agreement, any such notice shall be deemed to be given three business days after the date on which the same was deposited in a regularly

maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid.

13.02. *Records and Reports.* At the expense of the Company, the Managers shall keep or cause to be kept proper and complete records and books of account, in which shall be entered fully and accurately all transactions and other matters relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company. At a minimum the Company shall keep at its principal place of business the following records:

[a]     A current list of the full name and last known business, residence, or mailing address of each Member and Economic Interest Owner, both past and present;

[b]     A copy of the Articles of Organization of the Company and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

[c]     Copies of all of the Company's annual operating, capital, and special budgets;

[d]     Copies of statements revealing the financial condition and operations of the Company, its receipts and disbursements, and a list of its assets and liabilities, prepared in accordance with generally accepted accounting principles applied on a consistent basis from year to year.

[e]     Copies of the Company's federal, state, and local income tax returns and reports, if any, for the four most recent years;

[f]     Copies of the Company's currently effective written Operating Agreement, copies of any writings permitted or required with respect to a Member's obligation to contribute cash, property or services, and copies of any financial statements of the Company for the three most recent years;

[g]     Minutes of every annual, special meeting and court-ordered meeting;

[h]     Any written consents obtained from Members for actions taken by Members without a meeting;

[i]     All other relevant Company documents.

Such books and records shall be at all times maintained at the principal executive office of the Company and shall be open to the reasonable inspection and examination of the Members, Economic Interest Owners, or their duly authorized representatives during reasonable business hours.

13.03. *Application of Colorado Law.* This Operating Agreement and its interpretation, shall be governed exclusively by its terms and by the laws of the State of Colorado, and specifically the Act.

13.04. *Waiver of Action for Partition.* Each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that it may have to maintain any action for partition with respect to the property of the Company.

13.05. *Amendments.* This Operating Agreement may not be amended except by the unanimous written agreement of all of the Members.

13.06. *Execution of Additional Instruments.* Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

13.07. *Construction.* Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

13.08. *Headings.* The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any of its provisions.

13.09. *Waivers.* The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

13.10. *Rights and Remedies Cumulative.* The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

13.11. *Severability.* If any provision of this Operating Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

13.12. *Heirs, Successors, and Assigns*. Each and all of the covenants, terms, provisions and agreements in this Agreement contained shall be binding upon and inure to the benefit of the parties and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

13.13. *Creditors*. None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company or its Members.

13.14. *Counterparts*. This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

13.15. *Disclosure of Schedule A*. In order to preserve the confidentiality of this Agreement and the Company's relationship with certain of its employeesm agents, and other persons, the Company shall be authorized to prepare a redacted version of Schedule A that contains only the pertinent information relating to each Member and Economic Interest Owner and to deliver a copy of this Operating Agreement containing such a redacted version to each such Member and Economic Interest Owner in lieu of a complete copy of Schedule A.

**[Signatures on following page]**

The undersigned hereby agree, acknowledge and certify that the preceding Operating Agreement constitutes the Operating Agreement of Reed Group, LLC adopted by the Members of the Company and accepted by each Economic Interest Owner of the Company who has signed a separate signature page, all to be effective as of _____, 2005.

MEMBERS:

Date: _____        _____
                                         Presley Reed

Date: _____        _____
                                         Stacey Grace Reed

Date: _____        _____
                                         Peter B. Nagel, Trustee of the
                                         Presley Reed 1999 Family Trust

**[separate signature page for each Economic Interest Owner]**

**SCHEDULE A**

*Initial Capital Contributions, Profits Interests, Vested Interests*

| Name and Address | Capital Contribution | Profits Interest | Vested Percentage |
|---|---|---|---|
| **Members** | | | |
| Presley Reed<br>10155 Westmoor Drive, Suite 210<br>Westminster, Colorado 80021 | $_____.__ | 30.00 Percent | N/A |
| Stacey Grace Reed<br>10155 Westmoor Drive, Suite 210<br>Westminster, Colorado 80021 | $_____.__ | 30.00 Percent | N/A |
| Presley Reed 1999 Family Trust<br>999 Eighteenth Street, Suite 3000<br>Denver, Colorado 80202 | $_____.__ | 30.00 Percent | N/A |
| **Economic Interest Owners** | | | |
| Ken _____<br>_____<br>_____ | $0.00 | 2.00 Percent | 100.00% |
| Shauna Bryngleson<br>_____ | $0.00 | 1.00 Percent | 0.00% |
| Judith Combs<br>_____ | $0.00 | 1.00 Percent | 0.00% |
| Tom _____<br>_____<br>_____ | $0.00 | 0.25 Percent | 100.00% |
| Any _____<br>_____<br>_____ | $0.00 | 0.25 Percent | 0.00% |

Karen _____
_____
_____                    $0.00        0.25 Percent        0.00%
Denise _____
_____
_____                    $0.00        0.25 Percent        0.00%
Marty _____
_____
_____                    $0.00        1.00 Percent        0.00%
**Total**                                          96.00 Percent

**Exhibit 2a.  Moran's CEO Goals FY2005**

## CEO Goals
### Q1 2005

**FINANCIAL**
- Review Profitability Of Each Service Customer With Operations Managers And Agree On Plan To Address Problem Clients
- Develop Preliminary Budgets For 2005

**STRATEGY**
- Assign Resources To Determine Economic Model And Viability Of A "Data Business"
- Determine If A Joint Venture w/Clear Technology And Sycamore Ventures In the WC Makes Sense For Reed
- Determine If A Relationship With ACOEM Can Be Finalized

**MARKETING**
- Hire A New Chief Marketing Officer
- Plan For Launch Of MDA5
- Test Market Pricing Of MDA5
- Clarify Marketing Message For RGL
- Develop A Plan For A New Website

**TECHNOLOGY**
- Determine If Investment In New Technology Is Right For Reed

**OPERATIONS**
- Centralize Reporting Function
- Establish QA Function
- Create STD Product Offering And Streamline Implementation Flow

**SALES**
- Establish Sales Goals And Proper Commission Structures
- Refocus Partnership Strategy And Rework Business Arrangements As Time Permits

**CORPORATE**
- Establish New LLC.

**Exhibit 2b.  Phillips' Completion of Moran's FY2005Goals**

| Mr. Morans CEO Goals | Mr. Phillips Activities relative to the goal |
|---|---|
| STRATEGY :Determine If A Joint Venture w/Clear Technology And Sycamore Ventures In the WC Makes Sense For Reed | Mr. Phillips met numerous times with Sycamore, Mr. Ash Roy, Clear Technology, and prepared a 50 page analysis that was reviewed by Sycamore. |
| STRATEGY: Determine If A Relationship With ACOEM Can Be Finalized | Mr. Phillips spent 2000 hours and personally financed the Proof of Concept. This is now a major RGL product |
| MARKETING Hire A New Chief Marketing Officer | Mr. Phillips sourced and assisted in hiring Mr. Marty Reader, who still consults for the firm |
| TECHNOLOGY: Determine If Investment In New Technology Is Right For Reed | Mr. Phillips consulted to this project under the direct supervision of President Grace. |
| OPERATIONS: Create STD Product Offering And Streamline Implementation          Flow | Worked 100's of hours with teams at RGL to develop new method and workflow. |
| SALES: Refocus Partnership Strategy And Rework Business Arrangements          As          Time          Permits | Worked with VP Sales on almost all deals in her pipeline |
| CORPORATE: Establish New LLC. | Worked on team, managed by Presley created this structure. |